[No. B113866. Second Dist., Div. One. Feb. 16, 1999.]

In re ELMER GERARD PRATT on Habeas Corpus.

1298

**COUNSEL**

·Gil Garcetti, District Attorney, George M. Palmer, Head Deputy District Attorney, Brentford J. Ferreira, Deputy District Attorney; and Harry B. Sondheim for Appellant.

ACLU Foundation of Southern California, Mark D. Rosenbaum, David S. Schwartz; Law Offices of Robert Garcia, Robert Garcia; Anthony G. Amsterdam; NAACP Legal Defense and Education Fund, George Kendall; Tamburello, Hanlon & Waggener, Stuart Hanlon; Law Offices of Juliana Drous, Juliana Drous; Law Offices of Johnnie Cochran, Johnnie L. Cochran, Jr., Shawn Chapman; Robert Weisberg; Edwin E. Huddleson, Jr.; and James S. Liebman for Respondent.

Bostwick & Hoffman, Paul L. Hoffman; Anthony Arlidge; Peter Carter; and David Marshall for Amnesty International as Amicus Curiae on behalf of Respondent.

OPINION

MASTERSON, J.—At the conclusion of an evidentiary hearing, an able and experienced trial judge, applying well-established legal principles, granted Elmer Gerard Pratt's petition for writ of habeas corpus. The basis for the ruling was that, under *Brady* v. *Maryland* (1963) 373 U.S. 83 [83 S.Ct. 1194, 10 L.Ed.2d 215], Pratt had been deprived of evidence at his 1972 murder trial that would have "permitted potentially devastating cross-examination or other impeachment evidence" regarding prosecution witness Julius Butler, and that this deprivation undermined confidence in the verdict.[1] On the People's appeal, we find ourselves in agreement with the trial court. Accordingly, we affirm.

BACKGROUND

In August 1972, Pratt, a member of the Black Panther Party (BPP), was convicted of the December 18, 1968, murder of Caroline Olsen and assault with intent to commit murder of her husband, Kenneth Olsen, during a robbery perpetrated by two men on a tennis court in Santa Monica.[2] The conviction was affirmed on direct appeal. (*People* v. *Pratt* (Feb. 1, 1974) 22504 [nonpub. opn.].) In November 1979, Pratt filed a petition for writ of habeas corpus in superior court that was denied without an evidentiary hearing. The petition was renewed in this court. We issued an order to show cause, considered the matter, and also denied the petition without an evidentiary hearing. (*In re Pratt* (1980) 112 Cal.App.3d 795 [170 Cal.Rptr. 80].) A subsequent petition for writ of habeas corpus was filed in the United States District Court for the Central District of California in 1982 and denied in 1986 following an evidentiary hearing. The instant petition was filed in superior court in February 1996. An order to show cause issued and, following an evidentiary hearing before the Honorable Everett W. Dickey, the petition was granted on May 29, 1998. This appeal followed.[3]

1. *The 1972 Trial*

The transcript of Pratt's 1972 trial was received in evidence at the hearing before Judge Dickey. In sum, the trial evidence revealed that Pratt did not become a suspect in the case until October 1970, when a letter written by

---

[1] In order to obtain relief under *Brady*, a defendant must show that the prosecution suppressed favorable evidence that was material to the issue of guilt or punishment. (373 U.S. at p. 87 [83 S.Ct. at pp. 1196-1197].)

[2] The trial began in March 1972. It was based on an indictment returned by the grand jury in December 1970.

[3] An order granting relief on a petition for writ of habeas corpus is appealable by the People. (Pen. Code, § 1506.)

Julius Butler and given in a sealed envelope to a police officer in August 1969 was opened and its contents revealed. Thereafter, Pratt was identified by two eyewitnesses and linked to the getaway car. Further investigation associated Pratt with the gun used in the shooting, which had been seized from a BPP house. In defense, Pratt attacked the accuracy of the identifications, argued that the car and gun evidence did not prove that he was one of the assailants, and urged that Butler was not a credible witness. Pratt also presented an alibi defense.

## A. *Prosecution Case*

Prosecution evidence at trial established that, about 8:00 p.m. on December 18, 1968, two African-American men, one taller than the other, entered the Santa Monica hobby shop of Barbara Reed. The men spent about five minutes in the store, talked to Mrs. Reed, and left. Feeling apprehensive, Mrs. Reed locked the door. The men soon returned, and Mrs. Reed observed that the taller one had a gun. The shorter man shook the door. Mrs. Reed called the police.[4]

At roughly the same time that evening, Kenneth and Caroline Olsen were about to play tennis at a park in Santa Monica not far from the Reeds' hobby shop. Shortly after they had turned on the tennis court lights, the Olsens were approached by two African-American men. Both were carrying guns, one a .45-caliber pistol. The men ordered the Olsens to lie down and demanded their money. After some discussion, the Olsens directed the men to Mrs. Olsen's purse and to Mr. Olsen's wallet, which was in a tennis bag next to the purse. The men took the purse and tennis bag but then opened fire on the Olsens. Mr. Olsen, who sustained five gunshot wounds, survived. Mrs. Olsen was hit two times; she died in the hospital ten days after the shooting.

The evidence implicating Pratt in the shooting fell into three general categories: eyewitness identification evidence, circumstantial evidence, and evidence based on the testimony of Julius Butler, who asserted that Pratt had confessed the crimes to him. We discuss the evidence in these groupings.

### i. *Eyewitness Identification Evidence*

On December 19, 1968, Mrs. Reed gave Santa Monica police officers a description of the two men who had entered her shop. She described the

---

[4]Mrs. Reed's husband, Fred Reed, approached the hobby shop in his car about 8:00 p.m. and saw two African-American men, one of whom was wearing a safari jacket, attempting to get into the store.

taller man as 23 to 29 years old, 6 feet tall, about 155 pounds and wearing a light tan or beige jacket with loops hanging down on each side. She described the shorter man as 23 to 29 years of age, approximately 5 feet 8 to 5 feet 9 inches tall, weighing about 145 to 150 pounds. The latter had a medium light complexion, was clean looking with a very trim haircut; he was wearing black shoes, black or dark pants, and a light beige "Eisenhower" type jacket. She gave a similar description to another officer, who prepared a composite drawing. In her descriptions, Mrs. Reed did not mention that the shorter man had a scar on his face, a widow's peak, or any facial hair. Mrs. Reed was shown numerous photographs shortly after the incident but was unable to make an identification.

Mr. Olsen viewed photographs of potential suspects on seven or eight occasions. In December 1969, he selected a photograph of a person who had "strong similar features." A lineup was arranged at which, referring to the person whose photograph he had previously selected, Olsen stated that although "there was a possibility," he "didn't feel [he] could really make an identification of that person . . . ." Pratt was not the person in the photograph and the lineup.

In November 1970, after Pratt had become a suspect based on Butler's letter, Mrs. Reed and Mr. Olsen were each shown a 16-person photographic array, with two profile and two full-face shots of each person. We have inspected the photo array. Therein, Pratt appears to be five feet seven inches tall.[5] He is wearing a safari jacket. He also has a round scar in the middle of his forehead just above the bridge of his nose and his hair is receding at the temples. Reed and Olsen each selected Pratt's photograph and identified him as one of the two men they had seen on the night of the shootings. Reed and Olsen participated in two separate live lineups soon after their photo identifications had been made. Neither was able to identify anyone in these lineups.

At trial, Mrs. Reed unequivocally identified Pratt as the shorter of the two men who were in her shop on December 18, 1968. She testified that she had stood face-to-face with Pratt and that he was "about the same height" as she. One prominent feature that enabled her to identify Pratt was a round scar on his forehead between his eyes. Another important feature was what she characterized as a "widow's peak." He also had "very direct eyes, direct expression in his eyes, light-complected." While on the stand, Mrs. Reed was shown a "safari" jacket. She testified that the jacket resembled the one worn on the night of the shootings. Mrs. Reed insisted that she had in fact mentioned the facial scar and the widow's peak to police personnel when she

---

[5] A measuring stick is displayed in the photographs from which height can be determined.

gave her original descriptions immediately following the incident. She also said that she must have been misunderstood by the police when she described the men's jackets. The shorter man was wearing the safari jacket, not the Eisenhower jacket as set forth in police records.

At trial, Mr. Olsen also unequivocally identified Pratt as the shorter of the two assailants. During the incident, he was face-to-face with the assailants two or three times. Pratt, at around five feet eight inches, was the shorter of the two. Both men were clean-shaven. He did not notice that Pratt had a scar. However, he had looked into Pratt's eyes at the time of the crime, and one of Pratt's most distinguishing features was his "intensive" and "piercing eyes."

Pratt attacked the accuracy of Mrs. Reed's and Mr. Olsen's identifications. In support of this effort, Pratt urged that the photo array was unduly suggestive because he was the only one wearing a safari jacket, almost all of the other participants had darker complexions than his and they were also significantly taller.[6] Moreover, Mrs. Reed and Mr. Olsen had failed to notice the scar between Pratt's eyes, and Mrs. Reed had failed to describe his widow's peak. Neither mentioned facial hair which, as discussed below, Pratt claimed to have had in December 1968. Pratt also presented the testimony of an expert on eyewitness identification, who addressed the difficulties of making an accurate identification in a situation such as that presented in this case.

### ii. *Circumstantial Evidence of Guilt*

Mitchell Lackman was parked in his car near the tennis courts on the evening of December 18, 1968, when he heard shots. Lackman saw two African-American men get into a red car with a white canvas top. The license plate had dark numerals and a white background. Mrs. Reed's husband, who as noted above had noticed two African-American men near the hobby shop, saw them get into a car that had a light top and a dark body.

In December 1968, Pratt was the registered owner of a car that fit these descriptions. The car had North Carolina license plates, which have an appearance consistent with the plates Lackman saw. Pratt sought to minimize the importance of the identification of the car by presenting evidence that other members of the BPP, including Julius Butler, frequently drove the car, and that it was utilized as a "community car" for the BPP.

The seizure of a gun utilized in the shooting was the indirect result of an incident that occurred on January 17, 1969. At that time, Bunchy Carter, a

---

[6]Our review of the photographic array reveals that of the sixteen men depicted, only Pratt and two others are shorter than five feet ten inches.

leader of the Los Angeles branch of the BPP, and John Huggins, another BPP leader, were killed on the University of California at Los Angeles campus by members of a group called United Slaves or "US." Police officers thereafter "raided" a residence on West Century Boulevard where Huggins lived and in which officers believed members of the BPP were making plans to retaliate against US. During the raid, a .45-caliber pistol was recovered from a table in the front room. Several persons were arrested during the raid, including Pratt, who was standing next to a car in front of the residence. (Julius Butler was detained outside the residence during the raid but was not arrested.)

Ballistics testing conducted on the gun in December 1972 established that it had been used in the Santa Monica shootings. This was shown by examining markings on shell casings recovered at the scene. The markings on the casings matched firing pin and extractor marks made when the gun was test fired. However, no match could be made from the slugs that were test fired, leading to the inference that the barrel of the gun had either been changed or worn down through considerable use.

In defense, Pratt noted that the gun unquestionably had been available to numerous people and that he was not even in the house from which the gun was seized.

### iii. *Evidence Based on the Testimony of Julius Butler*

Butler testified at trial that he had been a Los Angeles County deputy sheriff for four years. He resigned in 1960 and thereafter worked as a beautician, running a beauty shop in Los Angeles. He joined the BPP in early 1968. On December 18, 1968, Pratt and "Tyrone" were in Butler's shop. Pratt told Butler that he was going on a mission and that if he did not return Butler should notify other BPP members that something might have happened to him. Pratt returned to the beauty shop later that evening and told Butler that he had shot some people in Santa Monica. The next day, at BPP headquarters, Pratt told Butler that a newspaper article he had been reading about the tennis court shooting described the "mission" he had been on the night before. Butler asked Pratt about the car; Pratt replied that he had hidden it. Pratt further stated that he had destroyed the barrel of the gun he had used. He later told Butler that he had used a .45-caliber pistol, which Butler described as the type of gun that Pratt normally carried.

Butler further testified that in April 1969, he, Pratt, Ollie Taylor and several others were at Butler's house. Taylor was being questioned about his possible affiliation with the "US" organization. At one point, Butler and Taylor were sitting next to each other, with Butler giving Taylor an opportunity to deny such affiliation. Pratt pointed a cocked gun in their direction.

He told Butler that he thought that Butler might be siding with Taylor and ordered Butler to hit Taylor, which Butler did. During the course of the interrogation, Pratt hit Taylor with his gun. One of Taylor's teeth was knocked out as a result of the incident.[7] Pratt and other BPP members also threatened Butler on other occasions, accusing him of being a police agent and a traitor. In approximately June 1969 Butler decided to leave the BPP due to these deteriorating relationships and philosophical differences.

Feeling he was in danger, Butler wrote what he considered to be an "insurance letter." In this letter, he asserted that Pratt had confessed to committing the Santa Monica shootings. He put the letter in an envelope, sealed it, and wrote on the outside that the envelope was to be opened only in the event of his death. On August 10, 1969, Butler gave the letter to Los Angeles Police Sergeant DuWayne Rice, whom Butler considered a friend. Sergeant Rice at first kept the letter himself, and later turned it over to Lieutenant Edward Henry, who kept it locked in a safe. At some point thereafter, Rice was the subject of an investigation by the Internal Affairs Division of the Los Angeles Police Department (LAPD). During the course of this investigation, he was questioned about the letter. Rice then asked Butler for permission to open the letter. Butler granted permission and the letter was opened in October 1970. Rice testified that Butler had acted as his unpaid informant for about one week before giving him the letter in August 1969.

On cross-examination, Butler testified that he was not "working" for the BPP or for "law enforcement" at the same time, had "severed any ties [he] had with law enforcement," and had not "worked" for the FBI or the CIA. Although he had never "inform[ed] on anybody," he had communicated with Rice about "party business" since November 1968, "acting as a liaison between party members and Sgt. Rice" on matters such as complaints about alleged harassment by Wilshire station police officers.

Butler further testified that before Bunchy Carter was killed, Carter had offered him a position as a leader of the Los Angeles branch of the BPP. However, Butler declined the offer. After Carter was killed, Pratt was selected to become the Los Angeles leader. Butler denied that this bothered him. He also denied that Pratt had reprimanded or disciplined him for the Ollie Taylor incident or that he had been expelled from the BPP in June 1969. Rather, Butler stated that he quit the BPP because of the threats against him and that, although he was satisfied with the national leadership of the BPP, he did not like Pratt's leadership in Los Angeles. In response to

---

[7] Pratt, Butler and others were prosecuted as a result of this incident. Butler, who was charged with four felony counts, pleaded no contest to the allegations.

a question about an inconsistency in his testimony before the grand jury and at trial, Butler said that he had not previously told an untruth, but that he had appeared as a "reluctant witness."

### B. Defense Evidence

Pratt testified in his own behalf and denied all of Butler's accusations. Defense witnesses asserted that he was in the San Francisco Bay Area at the time of the shootings and that he wore a goatee-type beard and a mustache almost constantly, including on December 18, 1968.[8]

### C. Verdict and Motion for a New Trial

The trial took place in many short sessions over a one-month period. (The reporter's transcript of proceedings from the prosecutor's opening statement to the point at which the parties rested is 1,340 pages.) Following four days of deliberations, a juror was excused and was replaced with an alternate. On the sixth day of deliberations, the foreperson told the court that the jury had taken six ballots, had not reached a verdict on either the murder or the assault with intent to commit murder count, and was deadlocked ten to two. Further deliberations were ordered. On the ninth day of deliberations, the foreman announced that the jury was deadlocked eleven to one. Deliberations were again ordered to continue. On the 10th day of deliberations, the jury returned its verdicts, finding Pratt guilty of all charges.[9]

Pratt moved for a new trial. One of the grounds asserted was newly discovered evidence regarding a statement made by Mr. Olsen at the live lineup following his December 1969 tentative photographic identification of someone other than Pratt. Olsen had testified at trial that he had been unable to make an identification at that lineup. However, a public defender who attended the lineup declared that each subject was directed to "make a statement with reference to having the person lay down." Pratt's motion for a new trial was denied.

### 2. Prior Petitions for Writ of Habeas Corpus

Pratt filed a petition for writ of habeas corpus in superior court in 1979 that was denied without an evidentiary hearing. In 1980, he renewed the

---

[8]None of the descriptions of the shorter assailant indicated that he had a beard. Whenever possible throughout the trial, Pratt elicited evidence that he consistently wore a beard, and shaved it off only for a short time for the funerals of Carter and Huggins in January 1969. In defense, Pratt's brother, Charles Pratt, identified a Polaroid photograph taken of Elmer Pratt, as one taken at a party the weekend after Christmas 1968. In the photograph, Pratt had a beard. However, in rebuttal, the prosecution presented evidence that the paper on which the photograph was printed had not been manufactured until May 1969.

[9]Over the course of the 10 days, the jury had asked for readbacks of testimony and for a 1968 calendar.

petition in this court, which we also denied without an evidentiary hearing. (*In re Pratt, supra,* 112 Cal.App.3d 795.) As we described in that opinion, Pratt contended that Butler "was an informant for the FBI, a fact he (Butler) denied at the original trial," that "the FBI 'had a spy in the defense camp' prior to and during the trial," that the FBI concealed surveillance evidence corroborative of Pratt's alibi defense, and that the prosecution presented false evidence at a pretrial motion to suppress the gun found in John Huggins's residence. (*Id.* at p. 852.)

Among other aspects of our earlier opinion, we carefully reviewed Butler's trial answers in response to questions about being an informant and concluded that Butler had not committed perjury, inasmuch as the questions he was asked did not specifically require the information about which Pratt asserted that Butler had lied. (112 Cal.App.3d at pp. 866-867.) We came to a similar conclusion with respect to whether Butler committed perjury with respect to whether he had been an informant for the LAPD. (*Id.* at pp. 870-875.)

A majority of this court denied Pratt's request for an evidentiary hearing and rejected all of his contentions. (112 Cal.App.3d at p. 886.) We noted, however, that "[o]ur conclusions and holdings herein are based on the information and documentation supplied this court by defense counsel, the California Attorney General's office and the FBI as of the date of filing this opinion. Should additional evidence be uncovered in the future from the above sources which adequately and legally support defendant's contentions, our determinations herein do not, of course, preclude the filing of a new petition seeking appropriate relief. [Citation.]" (*Id.* at p. 886, fn. 45.)

With respect to Pratt's later petition for writ of habeas corpus in federal court, the People characterize the issues considered there as follows: "1. The circumstances surrounding the discovery and search for the 'second suspect [in the tennis court shootings]'; [¶] 2. The extent of liaison between the LAPD and the FBI during and prior to trial; [¶] 3. The role Sergeant Ray Callihan played with respect to the above;[10] and [¶] 4. Allegations of wiretap surveillance of Black Panther Party Los Angeles headquarters by the LAPD and FBI." As mentioned above, that petition was denied in 1986.

### 3. *The Instant Petition for Writ of Habeas Corpus*

The petition for writ of habeas corpus from which this appeal arises was filed in February 1996. Three major claims were asserted.[11]

---

[10]Sergeant Callihan is not pertinent to Pratt's present claims.

[11]Some of the evidence relied upon in the instant petition was included in the petition we rejected in 1980 and in the petition rejected by the federal district court in 1986. On appeal,

One claim went to Pratt's alibi. Pratt asserted that the FBI knew he was in the San Francisco Bay Area at the time of the Santa Monica shootings. The evidentiary centerpiece of this claim was the declaration of a 25-year veteran FBI agent who had been in the Los Angeles office from 1970 through 1977. The agent declared that he heard a fellow agent who was assigned to investigate Pratt and the BPP say that Pratt had been in Oakland at the time of the shootings. The agent further declared that in 1976 and 1977, while in the course of reviewing FBI wiretap documents in anticipation of requests under the Freedom of Information Act, he noted that a wiretap had been installed at the Los Angeles BPP headquarters from November 15 through December 20, 1968. However, for the first time in his career the agent could not find any information about what was overheard as a result of the wiretap. Pratt also submitted declarations of four members of the BPP, who stated that Pratt was with them at a meeting in Oakland on December 18, 1968, but that they did not come forward to testify at trial because a disagreement within the BPP made them unwilling to render any assistance to Pratt at that time.

A second claim was based on the assertion that the crimes had been committed by two men known to associate with Julius Butler, who fit the descriptions of the assailants given by Mrs. Reed and Mr. Olsen. Information regarding these men was alleged to have been given to the police in November 1970. The claim was supported by declarations of BPP members and associates who had heard the two confess to the shootings and had seen Butler give a .45-caliber automatic pistol to one of them close to the time the shootings occurred. Pratt also offered photographs of the two, who had since been killed in separate incidents, to demonstrate that their appearance matched the descriptions reported by Reed and Olsen.

The third claim asserted violation of due process under *Brady* v. *Maryland, supra,* 373 U.S. 83, and Penal Code section 1473, subdivision (b)(1).[12] Its focus was Butler's credibility. The claim was based on evidence neither disclosed nor available at the 1972 trial that demonstrated the close nature of Butler's relationship with law enforcement personnel and his motivation for seeking to curry favor with law enforcement. At the hearing below, Judge

---

the People argue that Pratt's request for review of certain previously asserted evidence runs afoul of the rule against successor petitions. (See *In re Clark* (1993) 5 Cal.4th 750, 767-774 [21 Cal.Rptr.2d 509, 855 P.2d 729].) We find no abuse of the writ under *Clark* as to the evidence and claims included in the instant petition. Accordingly, we proceed to discuss them.

[12]Penal Code section 1473, subdivision (b)(1), permits a petition for habeas corpus to be granted upon a showing that "[f]alse evidence that is substantially material or probative on the issue of guilt or punishment was introduced against" the defendant. The grounds enumerated in section 1473 do not limit the right to seek habeas corpus relief on other, nonstatutory grounds. (Pen. Code, § 1473, subd. (d).)

Dickey stated that he wanted this claim to be the initial focus. As it turned out, the attack on Butler's credibility was the only claim fully litigated and was the sole ground on which Judge Dickey relied in making his decision.

## A. *Evidence Adduced at the Hearing*

Over 25 witnesses testified at the hearing. (At approximately 2,700 pages exclusive of closing argument, the transcript of this hearing is twice as long as the trial transcript.) Evidence adduced at that hearing included the following:

In 1968, 1969 and 1970, Lieutenant Henry was the head of community relations at the Wilshire Division of the Los Angeles Police Department. Sergeant Rice was his subordinate. Rice, who first met Julius Butler sometime before 1968, introduced Butler to Henry. Butler became Rice's and Henry's "source of information" regarding the BPP, including "the strategy and tactics to be used by the BPP in confronting the police." Such information was useful for planning "counter measures for whatever tactics [the BPP was] going to use."

On about August 5, 1969, Butler was expelled from the BPP. On August 10, Butler telephoned Rice and Rice went to Butler's apartment. When Rice arrived, Butler was standing on a nearby street corner. (On previous occasions, Rice had met with Butler at more private indoor locations.) Rice got out of his car and Butler gave the sealed "insurance letter" to him. Butler returned to his apartment, but as Rice was getting into his car, he was approached by two men who identified themselves as FBI agents. The men demanded that Rice give the letter to them, stating that it was "evidence." Rice identified himself as a police officer and refused the demand.

On August 13, 1969, FBI agents questioned Butler regarding possible violation of the National Arms Control Act based on his possession of a Thompson submachine gun. The next day, Butler told Rice that he had access to a machine gun that was in the hands of BPP members and that he could turn the gun over to the police if his identity were kept secret. On August 14, Rice and Henry met Butler at his apartment and drove to a house in the Pasadena area. Butler went inside and emerged with a suitcase that contained a new Thompson submachine gun and 1,000 rounds of ammunition. When the gun was booked into evidence, a booking slip was prepared which falsely stated that the gun had been found in a vacant lot based on an anonymous tip. Butler later turned over an M-1 rifle and another firearm to Rice, again stating that they belonged to the BPP. Butler was not prosecuted for possession of these weapons.

Meanwhile, in June 1969, Butler and six other members of the BPP (including Pratt) had been charged with felony false imprisonment and three counts of felonious assault arising out of the assault of Ollie Taylor the previous April, as summarized above. Initially, all of the defendants were represented by the same attorney. However, that attorney withdrew and arranged for Butler to be represented by other counsel. He did so when it appeared that Butler was working with the prosecution and wanted to plead guilty to all counts, even though a better deal was possible. The new attorney, Michael Somers, substituted in to represent Butler on September 19, 1969. On that day, with no involvement from Somers, Butler pleaded nolo contendere to the four felony counts.

A probation officer's report prepared following the plea recited: "Sergeant Rice, Community Relations Officer, Administrative Division, Los Angeles Police Department, indicated that the defendant has been cooperative with their department. He asserted that his department would be in agreement should the probation department recommend probation without the condition of time in custody." The probation officer recommended that probation be granted. Somers was surprised at the recommendation in view of the seriousness of the charges. However, at the October 29, 1969 sentencing hearing, the prosecutor voiced no objection to the probation officer's recommendation, which was followed by the trial court.[13]

In November 1969, Butler indicated his willingness to act as a confidential informant for the FBI. Over the next 18 months Butler provided information to the FBI on approximately 30 occasions. The information included BPP membership and activities, and accusations of crimes against BPP members.

Investigators from the office of the Los Angeles County District Attorney (LADA) also established a relationship with Butler. In late 1969 or early 1970, Butler's name came up in conversation among members of the Intelligence Division of the LADA's Bureau of Investigation. During this conversation, Investigator Fred Willis was told by one of his supervisors that before Willis could use information from Butler, Willis would have to get permission from the FBI because Butler "belonged" to FBI Agent George Akin. To Willis, this meant that Butler was an informant for the FBI. Willis spoke to Akin and thereafter contacted Butler. Willis received information from Butler regarding the BPP on several occasions; he considered Butler to be one of his confidential informants.

---

[13]The case against the other defendants went to trial twice in 1971, each time resulting in a hung jury. The prosecutor at those trials did not know that the assault had taken place in Butler's home or that Butler had pleaded to the charges. If he had known this, he would have called Butler as a witness.

In September or October 1971, several months before the start of Pratt's murder trial, LADA Investigator Morris Bowles gave Butler $200 to purchase a gun for self-protection. Butler bought a gun and typically carried it concealed on his person. Several members of the LADA's office were aware that Butler carried a gun, even though possession of a firearm by a convicted felon such as Butler is itself a felony. By January 1972, Butler had been entered into the intelligence division's index of confidential informants.

In June 1971, Butler's felony convictions were reduced to misdemeanors at the prosecutor's request, with no participation by defense counsel. In December 1973, the prosecutor moved to strike the fraud and violence allegations from these convictions so that Butler could qualify for membership in the California State Bar. The motion was granted.[14]

## B. *Judge Dickey's Ruling*

At the close of the hearing on March 13, 1997, Judge Dickey stated that he would not be ruling from the bench and commented: "I have been a judge almost 27 years. And I have never had a case with so much reading involved, even complex civil cases that I have done which usually involves a lot of documents as well. There is just a mountain of material [in this case], and I want to make sure that I don't overlook anything . . . ."

In a memorandum of decision dated May 29, 1997, Judge Dickey granted Pratt's petition for habeas corpus. On the issue under *Brady* v. *Maryland* of whether the suppressed evidence was "favorable," Judge Dickey found that the evidence presented at the habeas hearing "makes it clear" that Butler "had been, for at least three years before the trial [i.e., since March 1969], providing information about the Black Panther Party and individuals associated with it to law enforcement agencies on a confidential basis. These agencies included, on various occasions, the [LAPD], the [FBI] and the [LADA's] Office which prosecuted this case." This evidence, "if properly and timely disclosed to competent defense counsel, would have permitted potentially devastating cross-examination or other impeachment evidence regarding Butler in important respects."

In support of his conclusion that Butler had been providing information, Judge Dickey cited various items of evidence, including the LADA's own records listing Butler as a confidential informant in January 1972; that LADA Investigator Willis had been told by his supervisor that Butler

---

[14]Butler later completed law school, passed the bar exam, and was admitted to the State Bar.

"belonged" to an FBI agent; that Willis later considered Butler to be one of his confidential informants; that an LADA investigator provided Butler with money to purchase a concealable handgun and several law enforcement officers and prosecutors knew that Butler carried such a gun despite such possession being a felony; that upon the recommendation of Sergeant Rice Butler received probation with no jail time following his plea to the Ollie Taylor assault; and that immediately after Butler gave Rice the "insurance letter" in a public place, two FBI agents demanded that the letter be turned over as "evidence."

The reason the above information would have been "potentially devastating" to Butler was that "[a]lthough the jury was aware of Butler's animosity toward [Pratt], and fear of him in 1969, defense counsel did not have the information needed to explore other possibly more significant motivations for Butler to identify [Pratt] as the killer, such as a desire to extricate himself from his own legal difficulties and/or to ingratiate himself with prosecution and law enforcement agencies in Los Angeles on an ongoing basis for his own personal benefit. [¶] Along with Butler's false testimony at trial that 'I've never been an informant,' Sgt. Rice's testimony that Butler had only acted as a 'police informant' for him for 'about a week before August 10, 1969' but 'was not paid,' left a grossly inaccurate impression on the jury as to the scope of Butler's activities which was not corrected by the prosecutor at the time but which, in light of the nondisclosure, defense counsel was unable to challenge."

Judge Dickey further found that "the above information was available to the District Attorney from [its] own office and the Los Angeles Police Department . . . and even though the FBI records, which have been now presented to this Court, may not have been available to the prosecutor at [Pratt's] trial . . . none of this information was disclosed to [Pratt's] defense counsel." He rejected the People's arguments, discussed below, that certain evidence had not been "suppressed" under *Brady* because it was equally available to the defense and further found the suppressed evidence to have been "material" within the meaning of *Brady*. On this basis, Pratt's petition for writ of habeas corpus was granted.[15] The judgment against him was vacated, and he was discharged from the custody of the Department of Corrections and remanded to the custody of the Los Angeles County Sheriff for a new trial or other appropriate disposition.

---

[15]As an alternate ground for relief, Judge Dickey found that "[f]or the same reasons, [Pratt's] showing is sufficient for habeas corpus relief under Penal Code Section 1473, subdivision (b)(1)."

## LEGAL STANDARDS

### 1. *Brady v. Maryland*

■ In *Brady* v. *Maryland, supra,* 373 U.S. 83, the United States Supreme Court held that a defendant's right to due process is violated when "favorable" evidence that has been "suppressed" by the prosecution is "material" to the issue of guilt or punishment. The violation occurs even when the prosecution has not acted in bad faith and the favorable evidence has not been requested. (*Ibid.*; *Kyles* v. *Whitley* (1995) 514 U.S. 419, 432-433 [115 S.Ct. 1555, 1565, 131 L.Ed.2d 490]; *United States* v. *Bagley* (1985) 473 U.S. 667, 682 [105 S.Ct. 3375, 3380, 87 L.Ed.2d 481]; *In re Brown* (1998) 17 Cal.4th 873, 879 [72 Cal.Rptr.2d 698, 952 P.2d 715]; *In re Ferguson* (1971) 5 Cal.3d 525, 532-533 [96 Cal.Rptr. 594, 487 P.2d 1234].)

"Evidence is 'favorable' [under *Brady*] if it either helps the defendant or hurts the prosecution, as by impeaching one of its witnesses." (*In re Sassounian* (1995) 9 Cal.4th 535, 544 [37 Cal.Rptr.2d 446, 887 P.2d 527].) "A prosecutor's duty to disclose evidence favorable to the accused extends to evidence reflecting on the credibility of a material witness. [Citations.] This includes 'any inducements made to prosecution witnesses for favorable testimony . . . .' [Citation.]" (*People* v. *Kasim* (1997) 56 Cal.App.4th 1360, 1380 [66 Cal.Rptr.2d 494].)

As to "suppression," "[t]he scope of this disclosure obligation extends beyond the contents of the prosecutor's case file and encompasses the duty to ascertain as well as divulge 'any favorable evidence known to the others acting on the government's behalf . . . .' [Citation.] Courts have thus consistently 'decline[d] "to draw a distinction between different agencies under the same government, focusing instead upon the 'prosecution team' which includes both investigative and prosecutorial personnel." ' [Citation.]" (*In re Brown, supra,* 17 Cal.4th at p. 879.) Moreover, "[t]he duty to provide discovery is not limited to the time before trial; discovery is an ongoing responsibility, which extends throughout the duration of the trial and even after conviction. [Citations.]" (*People* v. *Kasim, supra,* 56 Cal.App.4th at pp. 1383-1384.)

Finally, "[e]vidence is 'material' [under *Brady*] 'only if there is a reasonable probability that, had [it] been disclosed to the defense, the result . . . would have been different.' [Citations.] The requisite 'reasonable probability' is a probability sufficient to 'undermine[] confidence in the outcome' on the part of the reviewing court. [Citations.]" (*In re Sassounian, supra,* 9 Cal.4th at p. 544.)

As stated in *In re Brown, supra,* 17 Cal.4th 873, analysis of *Brady* materiality emphasizes four factors. "First, '[a]lthough the constitutional duty is triggered by the potential impact of favorable but undisclosed evidence, a showing of materiality does not require demonstration by a preponderance that disclosure of the suppressed evidence would have resulted ultimately in the defendant's acquittal (whether based on the presence of reasonable doubt or acceptance of an explanation for the crime that does not inculpate the defendant). [Citations.] [The] touchstone of materiality is a "reasonable probability" of a different result, and the adjective is important. The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence.' [Citation.] [¶] Second, 'it is not a sufficiency of evidence test. A defendant need not demonstrate that after discounting the inculpatory evidence in light of the undisclosed evidence, there would not have been enough left to convict. The possibility of an acquittal on a criminal charge does not imply an insufficient evidentiary basis to convict. One does not show a *Brady* violation by demonstrating that some of the inculpatory evidence should have been excluded, but by showing that the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict.' [Citation.] [¶] Third, 'once a reviewing court applying [the test] has found constitutional error there is no need for further harmless-error review.' [Citation.] The one subsumes the other. [Citation.] [¶] Fourth, while the tendency and force of undisclosed evidence is evaluated item by item, its cumulative effect for purposes of materiality must be considered collectively. [Citation.]" (*In re Brown, supra,* 17 Cal.4th at pp. 886-887.) Thus, the probability of a different result is "assessed by considering the evidence in question under the totality of the relevant circumstances and not in isolation or in the abstract. [Citation.]" (*In re Sassounian, supra,* 9 Cal.4th at p. 544.)

Similarly, under Penal Code section 1473, subdivision (b)(1), "[f]alse evidence is 'substantially material or probative' if it is 'of such significance that it may have affected the outcome,' in the sense that 'with reasonable probability it could have affected the outcome . . . .' [Citation.] In other words, false evidence passes the indicated threshold if there is a 'reasonable probability' that, had it not been introduced, the result would have been different. [Citation.] The requisite 'reasonable probability,' [the California Supreme Court stated], is such as undermines the reviewing court's confidence in the outcome. [Citation.] It is dependent on the totality of the relevant circumstances. [Citation.] It is also . . . determined objectively. [Citation.]" (*In re Sassounian, supra,* 9 Cal.4th at p. 546, italics omitted.) There is no requirement under the statute that the defendant demonstrate that

"testimony was perjured or that the prosecutor or his agents were aware of the impropriety." (*In re Hall* (1981) 30 Cal.3d 408, 424 [179 Cal.Rptr. 223, 637 P.2d 690].)

## 2. *Review of Habeas Corpus Determination*

█ We start with the substantial evidence rule. This is because "the usual rule, that 'evidence must be taken most strongly in support of the order appealed from and conflicts must be resolved in favor of respondent,' is applicable on habeas corpus review. [Citation.]" (*In re Garcia* (1977) 67 Cal.App.3d 60, 65 [136 Cal.Rptr. 461].)[16]

No California case directly addresses the standard for review of a *Brady* determination made on habeas corpus review. Undoubtedly, such a determination involves mixed questions of law and fact. "Questions of fact concern the establishment of historical or physical facts; their resolution is reviewed under the substantial-evidence test. Questions of law relate to the selection of a rule; their resolution is reviewed independently. Mixed questions of law and fact concern the application of the rule to the facts and the consequent determination whether the rule is satisfied. If the pertinent inquiry requires application of experience with human affairs, the question is predominantly factual and its determination is reviewed under the substantial-evidence test. If, by contrast, the inquiry requires a critical consideration, in a factual context, of legal principles and their underlying values, the question is predominantly legal and its determination is reviewed independently. (See generally *People* v. *Louis* (1986) 42 Cal.3d 969, 985-987 [232 Cal.Rptr. 110; 728 P.2d 180].)" (*Crocker National Bank* v. *City and County of San Francisco* (1989) 49 Cal.3d 881, 888 [264 Cal.Rptr. 139, 782 P.2d 278].)

Similarly, as stated in the context of reviewing a question of juror misconduct, "[w]e accept the trial court's credibility determinations and findings on questions of historical fact if supported by substantial evidence. [Citations.] Whether prejudice arose from juror misconduct, however, is a mixed question of law and fact subject to an appellate court's independent

---

[16]The posture of this case as a People's appeal is to be differentiated from a situation in which an appellate court, reviewing a petition for writ of habeas corpus as a matter of original jurisdiction, assigns a referee to take evidence on the matter. There, the referee's determinations are not binding on the appellate court, although they are entitled to great weight when supported by substantial evidence. (See, e.g., *In re Malone* (1996) 12 Cal.4th 935, 946 [50 Cal.Rptr.2d 281, 911 P.2d 468].)

determination. [Citations.]" (*People* v. *Nesler* (1997) 16 Cal.4th 561, 582 [66 Cal.Rptr.2d 454, 941 P.2d 87].)[17]

■ The People contend that Judge Dickey's findings and conclusions under each of the three prongs of *Brady* were unsupported both factually and legally. We find no merit in the People's position.

### 1. *The Evidence Was "Favorable"*

The People do not take issue with the accuracy as historical fact of Judge Dickey's findings that Butler was listed as a confidential informant in the LADA's records, that one LADA investigator considered Butler to be his informant and another provided money for Butler to buy a gun which other law enforcement personnel were aware that Butler carried, that the LAPD created a false record to protect Butler's identity as the source of the Thompson submachine gun, that Sergeant Rice recommended that Butler be granted probation following Butler's pleas of no contest on the Ollie Taylor assault, and that the "insurance letter" was delivered to Rice in a public place and was immediately demanded by FBI agents. However, the People assert that this evidence would not, as required by *In re Sassounian, supra,* 9 Cal.4th at page 544, "hurt[] the prosecution, as by impeaching [Butler]." We disagree.

To be sure, the record fails to elucidate the full nature and extent of Butler's relationship with law enforcement or to provide a comprehensive explanation of his motivation in writing the "insurance letter." But under ·*Brady* it was not Pratt's burden to make such a showing. Rather, what Pratt was required to demonstrate was that he was deprived of evidence that could have undermined the credibility of Butler's assertion that he had confessed to the Santa Monica shootings. As stated by the Supreme Court in *United States* v. *Bagley, supra,* 473 U.S. 667, 676 [105 S.Ct. 3375, 3380]: "In the present case, the prosecutor failed to disclose evidence that the defense might have used to impeach the Government's witnesses by showing bias or

---

[17]The hearing below was replete with factual conflicts, many of which required determinations as to the credibility of witnesses. For example, Butler testified that LADA Investigator Morris Bowles gave him money to buy a gun; Bowles denied that he did so. LADA Investigator Fred Willis considered Butler to have operated as his informant; Butler denied that he so acted. In the portion of this opinion in which we have summarized the evidence adduced at the hearing before Judge Dickey, *ante,* we have set forth the facts in accordance with the requirement on appellate review that the evidence be viewed in the light most favorable to the prevailing party. (*People* v. *Johnson* (1980) 26 Cal.3d 557, 578 [162 Cal.Rptr. 431, 606 P.2d 738, 16 A.L.R.4th 1255].) We shall continue to do so where appropriate in the remainder of this opinion.

interest. Impeachment evidence, however, as well as exculpatory evidence, falls within the *Brady* rule. [Citation.] Such evidence is 'evidence favorable to an accused,' [citation] so that, if disclosed and used effectively, it may make the difference between conviction and acquittal. Cf. *Napue* v. *Illinois*, 360 U.S. 264, 269 (1959) [79 S.Ct. 1173, 1177, 3 L.Ed.2d 1217] ('The jury's estimate of the truthfulness and reliability of a given witness may well be determinative of guilt or innocence, and it is upon such subtle factors as the possible interest of the witness in testifying falsely that a defendant's life or liberty may depend')."

We do not see the issue as being whether the evidence produced and developed in the years following the trial could demonstrate that Butler actually perjured himself when he testified at trial that he had not been an informant or worked with law enforcement agencies. What is important is that the evidence clearly established the existence of a cooperative relationship with various law enforcement personnel that was much closer than Pratt was able to show or argue at trial.[18] As urged by Pratt's appellate counsel during oral argument to this court, had the information been provided to the defense, cross-examination of Butler would have included questions such as: "Mr. Butler: What about Sergeant Rice? What about Fred Willis? What about Captain Henry? This letter you wrote; why was the FBI there? Why did they know there was a letter? How did they know your name? What about the D.A.'s office, the same office that vouched for you, that said you

---

[18]In *In re Pratt, supra,* 112 Cal.App.3d 795, we utilized the Black's Law Dictionary (112 Cal.App.3d at p. 867, fn. 36) and the "FBI vernacular" meaning of informant (*id.* at p. 875) in rejecting Pratt's contention that "Butler perjured himself when he denied during the trial that he worked for the FBI and was an informant for the L.A.P.D. or the FBI." (*Id.* at p. 866.) The People argue that under the doctrine of the "law of the case," Judge Dickey was required to adhere to this court's earlier definitions of informant in determining the truth or falsity of Butler's trial testimony as it pertained to the issues raised in the habeas hearing. The argument is not well taken.

As noted above, our prior decision specifically left open the door for a new petition for habeas corpus "[s]hould additional evidence be uncovered." (112 Cal.App.3d at p. 886, fn. 45.) The "additional evidence" presented in the instant proceeding included, inter alia, Butler being given money to purchase a gun and being listed in police records as a confidential informant, and that Willis considered Butler to be his informant. The law of the case doctrine "is exclusively concerned with issues of law and not fact. [Citations.]" (*People* v. *Shuey* (1975) 13 Cal.3d 835, 842 [120 Cal.Rptr. 83, 533 P.2d 211].) It may be applied only where the evidence is the same in both proceedings. (*Ibid.*; see also *In re Reed* (1983) 33 Cal.3d 914, 918, fn. 2 [191 Cal.Rptr. 658, 663 P.2d 216].) The new evidence in this proceeding focused less on whether Butler fit within a particular definition of the word "informant" and more on the value to the defense of information regarding various aspects of Butler's close relationship with law enforcement personnel. Accordingly, Judge Dickey was not prohibited from concluding that the evidence discussed above should have been provided to defense counsel, "even if Butler did not consider himself an 'informant' in the most pejorative sense of the word."

were not an informant, that told Mr. Cochran [one of Pratt's trial attorneys] in the court, 'He was not an informant, there's no impeachment material'; well, didn't that same office consider you a confidential informant by listing you on an informant card? Didn't they give you $200 to buy a gun? Didn't they let you carry a gun around? Your plea in Ollie Taylor. . . . Who brokered your deal of nolo for four serious felonies by a Black Panther Party member where you walked scot-free out the door and didn't even have to testify? Who did that for you, Mr. Butler? Is it the same people who are saying that you are not an informant?"

This type of impeachment goes far beyond an attack on a witness's credibility in general, such as by eliciting evidence of a prior felony conviction. Indeed, had the evidence discussed herein been provided to the defense, it is quite possible that the prosecution would have advised Butler to admit his involvement with law enforcement agencies, thereby obviating the need to ask Butler the specific questions suggested by appellate counsel and opening the door for a full exploration of this involvement through cross-examination of the law enforcement personnel themselves. Cross-examination has been described as "the 'greatest legal engine ever invented for the discovery of truth.'" (*California* v. *Green* (1970) 399 U.S. 149, 158 [90 S.Ct. 1930, 1935, 26 L.Ed.2d 489], quoting 5 Wigmore, Evidence (3d ed. 1940) § 1367.) Absent information on which that cross-examination could be based, Pratt was not in a position to effectively use this right in an attempt to undermine Butler's credibility.

Based on the foregoing, we agree with Judge Dickey's conclusion that the information that was not available at trial would have permitted "potentially devastating cross-examination or other impeachment evidence regarding Butler in important respects." Accordingly, we hold that the requirement of *Brady* that the suppressed evidence be "favorable" was satisfied in this case.

2. *The Evidence Had Been "Suppressed"*

 "[I]nformation subject to disclosure by the prosecution [on discovery] [is] that 'readily available' to the prosecution and not accessible to the defense." (*In re Littlefield* (1993) 5 Cal.4th 122, 135 [19 Cal.Rptr.2d 248, 851 P.2d 42].) The People contend that three of the above items of evidence were accessible to the defense and therefore were not suppressed within the meaning of *Brady*. Again, we disagree.

The People first assert that Pratt had reasonable access to the probation officer's report regarding Butler in the Ollie Taylor prosecution and therefore could have discovered the reference in that report to Sergeant Rice's

recommendation of leniency for Butler. As the primary support for this position, the People rely on a portion of the trial transcript which reflects that the superior court file in the Taylor case had been brought to the trial court as part of a discussion of whether Butler could be impeached with prior felony convictions. The record reflects that trial counsel Cochran looked at two minute orders in the file but did not see anything to indicate whether Butler's convictions in the case were felonies or if they had been reduced to misdemeanors.

Noting the importance to Pratt of potential impeachment of Butler, the People assert that Pratt could and should have made a motion to unseal and inspect the probation officer's report that was contained in the superior court file.[19] However, we find no basis in law or logic to support the notion that Pratt was required to attempt to show good cause to inspect an otherwise confidential document when he had no idea what the document contained. Moreover, as stated by Judge Dickey, "It is simply disingenuous for [the People] to rely upon that argument when the District Attorney presumably had a copy of that probation report in [its] own files because it was the prosecuting agency in the 'Ollie Taylor' case against Butler in 1969."

The People further assert that, because it was known that the investigation of Sergeant Rice by internal affairs led to the opening of the "insurance letter," "it was incumbent upon Pratt's attorneys to subpoena the records of that investigation directly from the LAPD." According to the People, this would have revealed the events surrounding Butler's giving the Thompson submachine gun to Rice and Lieutenant Henry. Again, in the words of Judge Dickey, "That doctrine [of equal availability to the defense] has no application to this situation. It is highly unlikely that criminal defense attorneys for a known Black Panther leader in 1972 would have been able to obtain any information about a prosecution witness of the type mentioned herein just by asking law enforcement agents for it, especially where such extensive efforts were made to keep his informing activities confidential (such as the LAPD officers' falsifying of a police report with the permission of the Acting Police Chief concerning Butler's turning over a 'Panther' machine gun and ammunition so as to protect his identify as the source)." No more needs to be said.

The People also contend that the defense knew at the time of trial that Rice had been approached by FBI agents upon being given the "insurance letter." The basis of this contention is a reference to this event in a summary

---

[19]Under the version of Penal Code section 1203.05 that was in effect at the time, probation officers' reports were not open to public inspection, but could be made available upon a showing of good cause.

of an interview with Rice that the People claim was included in the prosecutor's trial notebook and was inspected by Attorney Cochran.[20] However, Cochran asserted below that the prosecutor did not give him these interview notes or otherwise disclose this information in the many discussions that occurred in open court regarding the letter and its delivery by Butler to Rice. Moreover, the prosecutor testified that he had no independent recollection of what had been in the notebook when Cochran inspected it in 1972, only that it generally looked the same now as it did then. This evidence simply does not support the People's position that the only reasonable inference that may be drawn is that the presence of FBI agents upon delivery of the letter was disclosed to the defense. Accordingly, Judge Dickey's finding to the contrary remains binding. (See *People* v. *Bean* (1988) 46 Cal.3d 919, 932 [251 Cal.Rptr. 467, 760 P.2d 996].)

### 3. *The Evidence Was "Material"*

■ Finally, the People contend that the "favorable" information which was "suppressed" was not "material" under *Brady* because, even without Butler's accusations, the evidence against Pratt was overwhelming. We find ourselves unable to profess confidence in a guilty verdict based solely on evidence unconnected to Butler.

The link between Pratt and the getaway car, although probative, is not compelling. Strong evidence was introduced that Pratt's car was frequently used by other members of the BPP, and it is certainly logical to infer that others might be using it if Pratt were in Oakland at the time of the shootings. Although the gun provided a strong link between the BPP and the shootings, Pratt was not inside the residence in which it was found. Indeed, the trial record establishes that the gun most likely would not have been admitted into evidence without Butler's testimony that Pratt typically carried that type of gun and that Pratt stated he had changed the barrel.

Mrs. Reed's and Mr. Olsen's eyewitness identifications of Pratt give us pause. As noted in our above summary of trial facts, Pratt's photograph was first selected from a 16-person array almost 2 years after the incident. In our view, Pratt's height as compared with the 15 others, as well as the fact that he was the only one wearing a safari jacket as had been described by the witnesses, rendered the array needlessly suggestive.[21] Moreover, although Mrs. Reed testified at trial that she was sure of her identification because of

---

[20] The notebook was received in evidence at the hearing below. We have inspected it as part of the exhibits that were transmitted to this court on appeal.

[21] We are, of course, aware that any issue as to whether the array was unduly suggestive in the constitutional sense (see *People* v. *Gordon* (1990) 50 Cal.3d 1223, 1242 [270 Cal.Rptr.

the scar on Pratt's forehead, according to police records (which Mrs. Reed asserted were in error) she had never mentioned the existence of the scar. Nor had she mentioned Pratt's widow's peak until after she had seen his photograph. Mr. Olsen had not mentioned the scar either, even though one of Pratt's most distinguishing features was his "intensive" and "piercing eyes." Mr. Olsen's claimed previous identification of another suspect also undermined the reliability of his identification of Pratt.

In *People* v. *Ruthford* (1975) 14 Cal.3d 399 [121 Cal.Rptr. 261, 534 P.2d 1341] (overruled on another ground in *In re Sassounian, supra,* 9 Cal.4th at pp. 545-546, fn. 7) the defendant was convicted on the basis of an eyewitness identification and the testimony of his codefendant: The victim had been unable to identify the defendant at a lineup, but made a positive identification of him in court. The defendant moved for a new trial on the ground that the prosecutor had failed to disclose that the codefendant had received inducements for his testimony. (14 Cal.3d at pp. 401-404.) Because, inter alia, the eyewitness testimony, while "reflecting [the victim's] conscientious conclusion, indicated some uncertainty on her part" (*id.* at p. 410) and because of "the dangers inherent in eyewitness identification" (*id.* at p. 410, fn. 4.), the conviction was reversed. Such reasoning is equally applicable to this case.

In addition to the evidence presented, the parties argue that materiality may be assessed based on the extent to which the trial prosecutor relied on Butler to make his case and on the length of jury deliberations. As to the former, Pratt points to a colloquy with the trial court in which the prosecutor characterized Pratt's statements to Butler as "bear[ing] all the earmarks of a confession."[22] The prosecutor further noted that "[i]f the jury believes [Julius] Butler, regardless of whether they believe or disbelieve the identification witnesses, Mr. Pratt is guilty, the case is over." The People, on the other hand, focus on the portion of the prosecutor's final argument in which he characterized Butler's testimony as "equally [as] crucial" as the other inculpatory evidence.[23]

The People further rely on *In re Sassounian, supra,* 9 Cal.4th 535, in which the defendant was convicted of special circumstance murder based on

---

451, 792 P.2d 251]) was resolved adversely to Pratt long ago. However, the fact that the array may have been properly admitted into evidence at trial does not prevent us from independently assessing how fair we think it was and therefore how much confidence may be inspired by identifications based on the array.

[22]"Without question, a confession can 'operate[] as a kind of evidentiary bombshell which shatters the defense.' [Citations.]" (*In re Sassounian, supra,* 9 Cal.4th at p. 548.)

[23]Only the prosecutor's closing final argument to the jury is included in the reporter's transcript. The prosecutor's initial closing argument and the defense argument to the jury apparently was never transcribed.

the victim's national origin. The defendant later sought a writ of habeas corpus on the special circumstance finding on the basis that a witness who testified at trial that the defendant told him the murder was motivated by the victim's Turkish origin later recanted this testimony. At an evidentiary hearing the witness had been characterized as " 'very strong' " and " 'significant.' " (*Id.* at p. 548.) The Supreme Court found that "[n]evertheless, whatever effect his testimony might have had depends on whether the jury found it believable. Whether it did is open to question." (*Ibid.*) However, in answering this question by minimizing the importance of the witness to the prosecution's case, the *Sassounian* court relied on the fact that the witness "was extensively impeached. [Citation.] As a consequence, the 'testimonial thread' that he plied became severely 'tattered.' [Citation.]" (*Ibid.*) Unlike *Sassounian*, no such impeachment occurred here.[24]

With respect to the length of jury deliberations, we have noted that the jury deliberated over a 10-day period. The same judge who presided at the 1972 trial heard and denied Pratt's request for an evidentiary hearing on habeas corpus in 1980. On the latter occasion she stated that the jury had deliberated for four and one-half of the ten days and that, given the length of the trial, she did not agree with the defense that the jury took a "long time" to deliberate. Judge Dickey reviewed the record with respect to the deliberations and concluded that it was "obvious the jury was having some difficulty." We have asked the parties to reach a stipulation as to the actual number of hours of deliberations, but they have been unable to do so.

The People again rely on *Sassounian*, where the Supreme Court found that "the fact that the jury devoted a great amount of time to deliberations and made several requests for rereading of testimony and clarification of instructions does not entail a conclusion that, with or without [the recanting witness's] testimony, the case was close as to first degree murder." (9 Cal.4th at pp. 548-549, fn. 10.) Rather, the length of deliberations was attributed to factors such as the extensiveness of the evidence, complexity of the law, the apparent sympathy many jurors had for the defendant, and to the difficulty in understanding instructions. (*Id.* at p. 549, fn. 10.) "That the jury expended so much time and effort in its deliberations strongly suggests that the [recanting witness's] testimony did not in fact 'operate[] as a kind of evidentiary bombshell which shatter[ed] the defense.' [Citation.]" (*Ibid.*)

We find that the parties' arguments with respect to prosecutorial emphasis and length of deliberations serve as an endorsement of the rule that, in

---

[24]The *Sassounian* court further found that evidence of the careful planning involved in the murder (the victim was shot while sitting inside his car), the defendant's fleeing without taking anything, and the defendant's " 'bad feelings towards the Turkish people' " overwhelmingly supported the special circumstance finding. (9 Cal.4th at pp. 548-549.)

determining materiality, the probability of a different result is "assessed by considering the evidence in question under the totality of the relevant circumstances and not in isolation or in the abstract. [Citation.]" (*In re Sassounian, supra,* 9 Cal.4th at p. 544.) A prosecutor's emphasis on a single category of evidence may reflect an accurate assessment of the strength of the case or may be an exercise in hyperbole. Similarly, the fact that a jury may have deliberated for a long period of time permits more than a single interpretation of its meaning.

In reaching our determination of materiality, we have carefully reviewed the "mountain of material" that was before Judge Dickey, the additional 432 pages of appellate briefs submitted by the parties, and their numerous less formal submissions. We conclude that, without Julius Butler, a verdict of guilt on what was otherwise presented at trial is not worthy of our confidence.

This was not a complex case with difficult instructions and certainly lacked the attribute of any sympathy for the defendant. Rather, the contest pitted the strength of the prosecution's inculpatory evidence against that of Pratt's alibi defense.[25] Butler's role in the trial, as the person to whom Pratt had allegedly confessed, was crucial. Having inspected the photo array and reviewed the other eyewitness identification evidence, we cannot say that these identifications, even when considered in conjunction with the additional circumstantial evidence presented, could provide the basis of a guilty verdict that would be worthy of our confidence, as required by *Brady* and its progeny.

## CONCLUSION

We express no opinion as to whether Pratt was one of the two men who shot the Olsens. That issue is not before us. Nor have we been called upon to consider whether any type of fabrication or misconduct on the part of law enforcement personnel or other governmental officials contributed to Pratt's conviction. Judge Dickey defined the parameters of the habeas corpus review from which the People have appealed, and we have stayed within those parameters. We have accepted Judge Dickey's factual resolutions of evidentiary conflicts when supported by substantial evidence (as all were), independently assessed the uncontradicted facts, and independently applied the facts to the established case law. Our conclusion is that the order

---

[25]We are mindful that Pratt's introduction of a photograph, which the prosecution later demonstrated did not support (and was apparently devastating to) his defense, permits an inference of Pratt's consciousness of guilt. We have factored this legal principle into our analysis.

granting Pratt's petition for writ of habeas corpus was properly granted under both *Brady* v. *Maryland, supra,* 373 U.S. 83 and Penal Code section 1473, subdivision (b)(1). Accordingly, that order is affirmed.

### DISPOSITION

The order (memorandum of decision) filed on May 29, 1997, is affirmed.

Spencer, P. J., and Vogel (Miriam A.), J., concurred.