ROBERT MICHAEL WILSON A/K/A PETER WILSON
A/K/A RICHARD WILSON *v.* STATE
OF MARYLAND

[No. 246, September Term, 1979.]

*Decided December 7, 1979.*

The cause was submitted on briefs to LOWE, LISS and WEANT, JJ.

Submitted by *Alan H. Murrell, Public Defender,* and *Martha Weisheit, Assistant Public Defender,* for appellant.

Submitted by *Stephen H. Sachs, Attorney General, Thomas P. Barbera, Assistant Attorney General, Sidney S. Campen, Jr., State's Attorney for Talbot County, Jane Tolar O'Connor, Assistant State's Attorney for Talbot County,* and *Thomas Hickman, State's Attorney for Carroll County,* for appellee.

WEANT, J., delivered the opinion of the Court.

On January 19, 1979, Robert Michael Wilson, the appellant, was convicted by a jury in the Circuit Court for Talbot County (Clark, J.), of the armed robbery of Calvin Scott, the armed robbery of Elsie Scott, burglary, conspiracy to commit burglary, and the use of a handgun in the commission of a

crime of violence. At the conclusion of the trial he was committed to the custody of the Division of Correction for a period of fifteen years for the Calvin Scott robbery with consecutive sentences of fifteen years for the Elsie Scott robbery, ten for the burglary, five for the conspiracy, and five for the handgun offense; a total of fifty years consecutive to any sentences he was already serving in other jurisdictions. On appeal he contends:

1. The court erred in failing to adequately instruct the jury on the standard of proof beyond a reasonable doubt;
2. the court erred in refusing to allow him to make his own closing argument to the jury;
3. the jury's verdicts were coerced by the time limit imposed by the court on its deliberations;
4. the burglary verdict was coerced by the court's supplemental instruction to the jury that it was "absolutely necessary" to return a verdict on this count;
5. a motel registration card was improperly admitted as a business record;
6. he was denied a fair and impartial trial by virtue of 1) the circumstances of his pre-trial detention, 2) his extradition to Maryland without a hearing, and 3) the court's refusal to grant him a continuance.

The record before us shows that at about 9:00 P.M. on Saturday, February 5, 1977, two masked men, armed with guns, broke into the home of Calvin Scott, a used car dealer, by firing a shot through the doorway as Calvin Scott was putting on the night latch. Calvin Scott was escorted upstairs where he and Mrs. Scott were robbed. The house was searched and the intruders discovered a safe. The Scotts were next brought downstairs and beaten until Calvin Scott opened the safe from which the intruders took approximately $70,000.00 in cash. Thereafter the Scotts were taken back upstairs and handcuffed to their iron frame bed where they remained until they were found the next afternoon by their granddaughter.

Investigation by the police revealed that at the time of the robbery a 1970 Chrysler had been seen parked near the Scott residence with an unidentified woman slumped down in the seat. The bullet that had been fired was recovered and determined to have come from a German Luger pistol.

On May 18, 1977, James Harkum, another used car dealer, gave a statement to the State's Attorney for Talbot County which was read into evidence during the trial. In this statement Harkum admitted that he had told one of his free-lance salesmen, Heinz Peter Cable, that Calvin Scott kept large sums of money at his house. Harkum said that on Saturday, February 5, 1977, Cable had advised him that Scott was to be robbed. Early the next morning Harkum said that he had received a call from Cable that the robbery had been accomplished and that later the same day Cable had given Harkum $2,000 as Harkum's share of the proceeds. Thereafter, on the following Monday, Harkum stated that Cable admitted to having a 1970 Chrysler that belonged to Harkum; the car was returned the same day.[1]

Harkum described Cable as a man of violent propensities who subsequently proposed that Harkum join him in other criminal adventures. Harkum added that he was afraid of Cable. He said he did not know any more about the robbery than what he read in the newspapers. He said that Cable's confederate was a park policeman named Wayne Morris. He also said that Larry Mears, another car salesman friend of Cable's, had suddenly shown up with $25,000 in cash to buy a boat.

While testifying for the State Harkum said that he was to receive probation and jail time; he also indicated that the police "wired" him for sound so that they could monitor his conversations with Cable. The record does not reveal any follow-up investigation by the State of Morris who died prior to the trial.

---

1. This statement implies that Harkum did not know that Cable had possession of this 1970 Chrysler until two days after the Scott robbery. At trial, however, Harkum testified that he lent his 1970 Chrysler to Cable the afternoon of February 5, 1977.

For purposes of clarification, the facts as they relate to Harkum, unless indicated otherwise, are taken from the statement he gave to the State's Attorney.

Heinz Peter Cable, a bouncer at a night club in the Annapolis area, also testified for the State in exchange for a five year sentence and the nol prossing of some unrelated charges. He said that while in Florida in the fall of 1976 he had met with William Gary Reynolds in order to plan a robbery of Scott. Thereafter, "at the beginning of February," Cable said that he had met Reynolds and the appellant at a bar in Glen Burnie. Then on Saturday, February 5, 1977, Reynolds, the appellant, and a young woman named "Tammy" had come to his boat. The group drove over to Easton where Cable said he had pointed out the Scott residence before returning to the Annapolis area. Late that night Cable said he met with the trio again and was advised that the robbery had been accomplished. At this time he was given his share of the proceeds.

There is nothing in the record concerning the further investigation of Reynolds although his physical build was similar to one of the masked men who robbed the Scotts. Although "Tammy" had testified before the grand jury, she could not be located by the State at the time of trial. However, in its case-in-chief and on rebuttal the State introduced evidence that "Tammy" had registered for two rooms with a party of two at an Annapolis motel the night of the robbery.

The appellant, who was acquainted with the Maryland area, presented testimony that in late January or early February of 1977 he had met Reynolds and Cable at a bar in Glen Burnie. This testimony showed he had sold his German Luger pistol, on credit, to Cable who was interested in and collected Second World War guns. Allegedly, this was the only contact he had had with Cable. Members of the appellant's family testified that on the night of February 5, 1977, he was at a party in Boston in honor of his niece.

On his own behalf, the appellant testified that in mid-February of 1977, while driving to Florida to sell certain paintings,[2] he stopped in Baltimore and recovered his German

---

2. Unbeknown to the appellant, he was dealing with undercover FBI Agents who on March 11, 1977, arrested the appellant and his two companions. Among the weapons taken from the men was a German Luger pistol from which the bullet recovered from the Scott residence had been fired. The appellant explained that when he was arrested word had been sent

Luger from Gary Reynolds. In addition he explained in detail that he was an expert safe cracker and that, if he had done the robbery, he would have popped the safe open in two or three minutes. He said that his modus operandi did not involve beating elderly people like the Scotts just to get a safe open. He admitted committing many crimes but steadfastly denied robbing the Scotts. At allocution he reiterated his innocence and cautioned the court that the Scott robber was still at large.

1.

The appellant first contends that the court inadequately instructed the jury as to the law regarding the meaning of the term "beyond a reasonable doubt."

After the jury was empaneled the court gave a series of preliminary instructions wherein it explained the term "beyond a reasonable doubt" as follows:

> The test of the evidence is, as I have said, one of reasonable doubt. And reasonable doubt is a doubt based on reason and common sense, the kind of doubt that would cause a reasonable person to hesitate to act. Proof beyond any reasonable doubt is therefore that proof which is of such a character that a reasonable person would not hesitate to rely and act upon it in the most important of his own affairs. Thus, the State is not required to prove the defendant guilty beyond all possible doubt, or to a mathematical certainty, nor is the State required to negate or deny the existence or truth of every conceivable circumstance of innocence. The defendant is entitled to every favorable inference which can reasonably be drawn from the evidence. The jury will remember that the defendant is never to be convicted on mere suspicion, conjecture, or guesswork. The burden is always upon the State to

out that he needed money. Some $13,000 was sent to him in care of "Tammy" who was with him at the time. Thereafter "Tammy" had decamped with the money and the appellant's car.

> prove guilt beyond a reasonable doubt. This burden of proof never shifts to the defendant. The law does not impose upon the defendant the duty of calling any witnesses or producing any evidence at all.
>
> So, if the jury, after careful consideration of all the evidence, has any reasonable doubt that the defendant is guilty, it must acquit. If the jury views the evidence as reasonably permitting either of two conclusions, one of innocence and one of guilt, the jury should adopt the one of innocence.

Furthermore, instructions delivered at the close of all the evidence covered twenty four pages of transcript and contained at least ten references to the phrase "beyond a reasonable doubt." At the conclusion of the latter instructions, the appellant objected to the wording of one of the instructions in which the term "beyond a reasonable doubt" was used. He did not however make any objection which can be read as raising the contention now before us, *i.e.,* that because the term "beyond a reasonable doubt" was explained to the jury before the presentation of evidence but not afterwards, the court's instructions were inadequate.

As stated in Maryland Rule 757.f.:

> If a party has an objection to any instructions, to any omission therefrom, or to the failure to give an instruction *he shall make the objection on the record before the jury retires to consider its verdict and shall state distinctly the matter or omission, or failure to instruct to which he objects and the grounds of his objection.* Upon request of any party, the court shall receive objections out of the hearing of the jury. [Emphasis added].

We therefore find that the issue now being considered was not preserved for appeal. Maryland Rule 1085. *See also Brown v. State,* 203 Md. 126, 100 A.2d 7 (1953); *Patterson v. State,* 22 Md. App. 13, 321 A.2d 544 (1974), *aff'd,* 275 Md. 563, 342 A.2d 660 (1975); *Law v. State,* 21 Md. App. 13, 318 A.2d 859 (1974), *cert. denied,* 272 Md. 744 (1974) and 272 Md. 749 (1974).

We are nevertheless cognizant of Maryland Rule 757.h. which provides that

> [a]n objection is not reviewable as of right unless it is made in compliance with section f of this Rule. *An appellate court,* either upon its own motion or *upon the suggestion of a party, may take cognizance of and correct any plain error in the instructions, material to the rights of the defendant even though the error was not objected to as provided by section f of this Rule.* [Emphasis added].

We, however, are unable to find "any plain error in the instructions, material to the rights of the [appellant]." Maryland Rule 757.b. provides in part that "[t]he court need not grant any requested instruction *if the matter is fairly covered by the instructions actually given,*" (emphasis added). That the instruction, given at the beginning of the trial but not at the close of the evidence, was an "appropriate" one in a criminal case is clear. In *Lambert v. State,* 193 Md. 551, 559, 69 A.2d 461, 464 (1949), the Court of Appeals said:

> In more recent years some of the courts have expressed the opinion that the English language is not adequate to give a specific definition of "reasonable doubt" that would simplify its meaning, for the rule requiring that the jury must be satisfied beyond a reasonable doubt is generally as simple and intelligible as a guide for the jury as any rule that could be formulated. In fact, it is recognized that the rule is quite frequently made obscure by attempts at definition, which serve to create doubts instead of removing them. This danger of confusing the minds of the jurors in attempting to define "reasonable doubt" has prompted some of the trial judges to refuse to attempt to give any definition. Of course, a definition is not reversible error unless, by reason of peculiar circumstances or phraseology, such an instruction misleads or confuses the jury. *State v. Craft,* 131 W. Va. 195, 47 S.E.2d 681, 687. Nevertheless, it has been the general practice of the

overwhelming majority of the courts of this country to offer the jury some explanation of the term.

We therefore believe that even if the appellant had requested the court to repeat its explanation of the term "proof beyond a reasonable doubt," it would not have been compelled to do so. *Jones v. Jones,* 38 Md. App. 288, 380 A.2d 659 (1977), *rev'd on other grounds,* 283 Md. 709, 393 A.2d 1372 (1978); *Raley v. State,* 32 Md. App. 515, 363 A.2d 261 (1976), *cert. denied,* 278 Md. 731 (1976) and 431 U.S. 965, 97 S.Ct. 2921, 53 L.Ed.2d 1060 (1977); *England v. State,* 21 Md. App. 412, 320 A.2d 66 (1974), *aff'd,* 274 Md. 264, 334 A.2d 98 (1975).

Moreover, in light of the language of Maryland Rule 757.d. which provides that

> [t]he court *may* give its instructions at any time after the close of the evidence. If, however, the court's charge is not delivered until after the argument of counsel to the jury, the court shall, in advance of such argument, advise counsel of its proposed action on the request for instructions and the substance of the instructions which it proposes to give, [emphasis added]

we are unable to say that the court's failure to repeat the preliminary instructions concerning reasonable doubt warrants reversal of the judgments of conviction in the instant case. The language of Maryland Rule 757.d. is not mandatory, *i.e.,* it does not state that the court *shall* "give its instructions ... after the close of evidence." Furthermore, one purpose of the rule, as stated, is, apparently, to give counsel the opportunity to reflect upon the court's instructions in their argument to the jury. Such an opportunity is clearly present in a situation where instructions are given to the jury before any evidence is presented, as was the situation in the instant case. Therefore, the court below did not commit plain error in giving instructions in the sequence that it did.[3]

---

3. Although we are unable to say that the court below plainly erred in failing to repeat its preliminary instruction, we believe that the better practice is to repeat the instruction, thereby leaving no room for controversy on the subject.

## 2.

The appellant next argues that the trial court erred in failing to allow him to make his own closing argument to the jury.

Having arrived at that point in the case where all of the proof was in and the time had come when counsel ordinarily present their arguments to the jury, the prophetic words of Justice Blackmun in the case of *Faretta v. California,* 422 U.S. 806, 95 S.Ct. 2525, 45 L.Ed. 2d 562 (1975), were again brought to surface by the request of the appellant to argue his case to the jury, these words having previously been noted in the case of *Snead v. State,* 286 Md. 122 (1979), in the Court of Appeals of Maryland.[4]

In our case the appellant raised the problem with the following:

> [DEFENSE COUNSEL]: Your Honor, before the jury comes in, Mr. Wilson has requested me to ask Your Honor to permit the argument to the jury to be bifurcated; that is, that I argue to the jury, and that he would argue to the jury those points that I have not raised. I assume the Court has made a ruling on that.
>
> [STATE'S ATTORNEY]: We would, of course, object, Your Honor.
>
> [THE COURT]: Yes, I'll sustain the objection.

Relying on the implied constitutional right to self-representation discovered by the Supreme Court in the sixth amendment in the case of *Faretta, supra,* the Court of Appeals in *Snead* suggests that Rule 723 of the Maryland Rules of Procedure be used to determine whether or not a defendant has effectively waived the assistance of counsel and has thus established the right to self-representation. That case, however, involved an instance where the defendant

---

4. Justice Blackmun commented in his dissent that "[i]n conclusion, I note briefly the procedural problems that, I suspect, today's decision will visit upon trial courts in the future.... How soon in the criminal proceeding must a defendant decide between proceeding by counsel or pro se? Must he be allowed to switch in midtrial? ..." *Faretta v. State,* 422 U.S. at 852, 95 S.Ct. at 2549, 45 L.Ed.2d at 591-92.

indicated a desire to represent himself at the very beginning of the proceedings. Anticipating our problem, but without considering same, the Court observed in footnote 7 of *Snead* that "the question whether a defendant may assert the right to self-representation after the trial has begun is not before us, and we do not consider it."

The problem entertained by *Snead* is a procedural one, *i.e.,* the determination of how the right to self-representation should be asserted at the beginning of trial. That case held that, when a defendant indicates a desire to defend himself, the court must determine whether his desire to do so is clear and unequivocal. Thereafter, it becomes the duty of the court to ascertain whether the defendant has effectively waived the assistance of counsel. Our problem is one of determining whether a defendant has a right to "switch in midtrial" and ascribe to himself the job of co-counsel. As mentioned, neither *Faretta* nor *Snead* has broached this facet of self-representation.

This Court, in the case of *Beard v. State,* 42 Md. App. 276, 288, 399 A.2d 1383, 1390 (1979), dubbed this procedure as "hybrid representation" indicating that it is discretionary with the court. The case of *United States v. Hill,* 526 F.2d 1019 (10th Cir. 1975), *cert. denied,* 425 U.S. 940, 96 S.Ct. 1676, 48 L.Ed.2d 182 (1976), considered this question. The court said at page 1024:

> The record convinces us the request was for hybrid representation. The written motion clearly proposed hybrid representation, and most of appellant's remarks are consistent with a hybrid representation request.
>
> Prior to *Faretta,* courts had stated that a party had a right to represent himself or to be represented by counsel but did not have a right to hybrid representation. *Lee v. Alabama,* 406 F.2d 466 (5th Cir. 1968), *cert. denied,* 395 U.S. 927, 89 S.Ct. 1787, 23 L.Ed.2d 247 (1969); *Brasier v. Jeary,* 256 F.2d 474 (8th Cir.), *cert. denied,* 358 U.S. 867, 79 S.Ct. 97, 3 L.Ed.2d 99 (1958) (a civil case); *Duke v. United States,* 255 F.2d 721 (9th Cir.), *cert. denied,* 357 U.S.

920, 78 S.Ct. 1361, 2 L.Ed.2d 1365 (1958). *See also United States v. Dellinger,* 472 F.2d 340 (7th Cir. 1972), *cert. denied,* 410 U.S. 970, 93 S.Ct. 1443, 35 L.Ed.2d 706 (1973); *United States v. Conder,* 423 F.2d 904 (6th Cir.), *cert. denied,* 400 U.S. 958, 91 S.Ct. 357, 27 L.Ed.2d 267 (1970); *Shelton v. United States,* 205 F.2d 806 (5th Cir.), *appeal dismissed,* 346 U.S. 892, 74 S.Ct. 230, 98 L.Ed. 395 (1953). Since *Faretta,* at least one district court has determined that a criminal defendant already represented by counsel has no right to act as her own co-counsel. *United States v. Swinton,* 400 F.Supp. 805 (S.D.N.Y. 1975). These decisions do not foreclose a trial judge from allowing hybrid representation in appropriate cases; rather, they indicate no right to hybrid representation exists. *Brasier v. Jeary, supra; United States v. Swinton, supra.* Furthermore, we see no reason to distinguish between this case where retained counsel is involved in the request for hybrid representation and cases where appointed counsel is involved in such requests. *See Duke v. United States, supra.*

We believe *Faretta* does not alter the established rules concerning hybrid representation. As noted in *Swinton,*

> ... Faretta ratified a consensus within the federal judiciary favoring a constitutional right to *pro se* status; that consensus has existed side by side with another finding that a defendant's appearance as co-counsel lies within the discretion of the trial court.

The Sixth Amendment does not give any indication that hybrid representation is a right of constitutional dimensions.

In the case of *United States v. Lang,* 527 F.2d 1264 (4th Cir. 1975), *cert. denied,* 424 U.S. 920, 96 S.Ct. 1127, 47 L.Ed.2d 328 (1976), the United States Court of Appeals for the Fourth Circuit indicated that it was not error to deny a motion made

by a criminal defendant to appear as co-counsel, absent an indication of some special need, relying on *United States v. Shea,* 508 F.2d 82 (5th Cir. 1975), *cert. denied,* 423 U.S. 847, 96 S.Ct. 87, 46 L.Ed.2d 69 (1975); *Duke v. United States,* 255 F.2d 721 (9th Cir. 1958), *cert. denied,* 357 U.S. 920, 78 S.Ct. 1361, 2 L.Ed.2d 365 (1958); *United States v. Swinton,* 400 F.Supp. 805 (S.D.N.Y. 1975).

In the case of *United States v. Sacco,* 571 F.2d 791, 793 (4th Cir. 1978), *cert. denied,* 435 U.S. 999, 98 S.Ct. 1656, 56 L.Ed.2d 90 (1978), the court made the following comment in considering whether to allow a defendant to serve as co-counsel:

> *Faretta* held that a criminal defendant has a constitutional right to represent himself *pro se* if he voluntarily and intelligently elects to do so. But *Faretta,* which emphasized the element of coercion in forcing unwanted counsel upon a defendant, 422 U.S. at 820-21, 833-34, 95 S.Ct. 2525, does not speak to the question of joint representation, and the federal courts have uniformly held that there is no correlative right to serve as co-counsel. *E.g., United States v. Hill,* 526 F.2d 1019 (10th Cir. 1975), *cert. denied,* 425 U.S. 940, 96 S.Ct. 1676, 48 L.Ed.2d 182 (1976). We have stated that a district court need not permit a defendant to appear as co-counsel unless there is a showing of special need. *United States v. Lang,* 527 F. 1264, 1265 (4th Cir. 1975).
>
> Defendant claims that a special need existed here because his greater familiarity with the facts would have enabled him to cross-examine more effectively than his attorney. We do not think that this amounts to the type of special need envisioned in *Lang,* however, for defendant could have sufficiently informed his counsel about the facts to allow him to perform adequately.

It seems clear then that the hybrid representation is, at best, in the discretion of the court to be allowed only on the indication of some special need. Since this is not a

constitutional right, we see no necessity for any special catechismic exercise to be followed by the court. In the case *sub judice* the premise of the attorney's request for the defendant is "that he [the defendant] would argue to the jury those points that I [counsel] have not raised." We certainly can find no special need in this argument.

### 3.

The appellant's third contention is that the court, by imposing a time limitation on the jury's deliberations, coerced the jury's verdicts.

The jury began its deliberations at 8:38 P.M., Friday, January 19, 1979. Around midnight the court asked the bailiff to inquire of the foreman whether the jury was "near a verdict." The following colloquy then occurred:

THE BAILIFF: Your Honor, they said they would like to have another hour.

THE COURT: All right.

THE BAILIFF: The Foreman says, if possible, he would like to speak to you privately.

THE COURT: I don't believe that's possible.

THE BAILIFF: He said they'd rather be another hour and finish, rather than be put up.

THE COURT: They understand that we are going to lodge them for the night if they can't arrive at their verdicts within an hour?

THE BAILIFF: That's correct.

THE COURT: They understand that?

THE BAILIFF: Yes, sir.

THE COURT: Very well, we will give them an hour.

THE BAILIFF: Very well, sir.

THE COURT: To continue their deliberations.

(Off the record.)

THE BAILIFF: They will work on it for an hour, Your Honor.

THE COURT: I'll be in my chambers subject to call.

No objection to this interlocution was made. Accordingly the issue has not been preserved for appeal. Maryland Rule 1085.

4.

The appellant contends the jury's verdict on the burglary charge was coerced by the court.

The record shows that at 12:46 A.M. the jury sent a message to the court stating that it had reached guilty verdicts on the two robberies and one handgun count and asked whether it should consider any other counts. The court discussed the matter with counsel and it was agreed that the jury should also return verdicts on the burglary and conspiracy to commit burglary charges. As a result the jury was called in and the following instruction was given:

> [THE COURT]: In view of those verdicts, it is absolutely necessary to return a verdict on the 11th count charging burglary, one way or the other. Irregardless [*sic*] of how you decide that count, it will likewise be necessary for you to return a verdict on the 12th count, which is conspiring to commit burglary.
>
> However, if you find him not guilty on conspiring to commit burglary, then you must consider the third count, which is conspiring to commit armed robbery.
>
> If you find him not guilty of the third count, then you must consider the sixth count, and return a verdict on that, which is conspiring to commit simple robbery, or just plain robbery.
>
> Is that clear, ladies and gentlemen?
>
> THE FOREMAN: Thank you, Your Honor.
>
> THE COURT: You may retire to your jury room to complete your deliberations.

Based upon the foregoing, the appellant argues that his burglary conviction should be reversed because the court's instruction, that "it was absolutely necessary to return a verdict," amounted to impermissible coercion. The appellant

however seems to disregard the jury's response to this instruction, which was as follows:

THE FOREMAN: We are prepared to make a report at this time. We have made some progress in our deliberations, pending your reply. And I'm prepared to give you an account on all points.
THE COURT: On all points?
THE FOREMAN: Yes, sir.

In light of the absence of any objection by the appellant with regard to the court's supplemental instruction, this issue was not preserved for appeal. Maryland Rule 1085. Nevertheless, it is clear from the jury's response that it had already reached a decision as to the appellant's guilt on the burglary count when it inquired of the court whether it should consider any counts other than those pertaining to the robberies and the handgun violation; therefore, we find that this verdict was not coerced.

## 5.

The appellant's fifth contention is that the court erred in admitting into evidence a motel registration card since such constituted hearsay.

Inasmuch as the State did not have an eyewitness, other than an admitted accomplice, that could identify the appellant as being in the Annapolis area at the time of the robbery, the State resorted to circumstantial evidence to imply the appellant's presence. It introduced a motel registration card that indicated that the appellant's girlfriend "Tammy" had taken two rooms in an Annapolis motel the night before the robbery occurred. The court admitted the card as a business record under the business record exception to the hearsay rule. [Courts and Judicial Proceedings Article, § 10-101].

In *Hyman v. State,* 4 Md. App. 636, 641, 244 A.2d 616, 618 (1968), *cert. denied,* 252 Md. 731 (1969), we said:

We think it clear that the statute contemplates the introduction of the record itself in evidence as a prerequisite to the admissibility of testimonial

assertions relative to its contents by a witness having no personal knowledge of the truth of the matters contained in the record. A proper foundation must therefore be laid showing when the record was made, that it was made in the regular course of business, and it was the regular course of business to make such record. [Citations omitted].

At trial in the instant case, the motel proprietor testified that she operated the motel. She explained that when anyone registered for a room she required them to complete a registration card, which she then kept as a matter of routine business procedure. The proprietor identified the card as one that had been made on February 4, 1977, in the conduct of her regular course of business. All of the elements constituting a proper foundation were established; there was no error in the court's admitting the registration card.

### 6.

Under his argument that he was denied a fair and impartial trial, the appellant presents three unrelated reasons why his trial lacked fairness.

First, he complains that he suffered numerous "abuses and restrictions" during his pre-trial confinement which prevented him from effectively communicating with both his trial lawyer and an investigator. He argues that his right to effective counsel was therefore directly restricted.

Our review of the record shows that when any such complaint was brought to the court's attention, the court promptly and personally intervened to have it corrected. Moreover, since the appellant in his brief has not presented us with the facts he relies upon to support his claim, we deem his argument concerning "abuse and restriction" to be waived. *Van Meter v. State,* 30 Md. App. 406, 352 A.2d 850 (1976), *cert. denied,* 278 Md. 737 (1976). Maryland Rule 1085.

Next he complains that the Interstate Detainer Act was violated because he was extradited to Maryland without a hearing. Section 616 E of Article 27 (The Interstate Detainer

Act) does not provide a prisoner with such a right. Accordingly, we find no error.

Lastly he complains that the court erred in not granting his request for a postponement. A pre-trial hearing was held on January 9, 1979, one week before the trial began, to consider the request for a postponement. It was denied. As the appellant correctly notes: "The granting of a continuance, . . . is within the sound discretion of the trial court." *Johnson v. State,* 237 Md. 283, 288, 206 A.2d 138, 141 (1964). *See also McKenzie v. State,* 236 Md. 597, 204 A.2d 678 (1964); *Mazer v. State,* 231 Md. 40, 188 A.2d 552 (1962). Our independent review of the record indicates that this discretion was not abused by the court below.

*Judgments affirmed.*
*Costs to be paid by appellant.*