768 A.2d 675

**Robert Michael WILSON,**

v.

**STATE of Maryland.**

**No. 65, Sept. Term, 2000.**

Court of Appeals of Maryland.

March 9, 2001.

334

336

Kirk Y. Griffin (Law Offices of Kirk Y. Griffin of Boston, MA; Robert E. McGowan, Law Offices of Robert E. McGowan, Bowie), on brief, for petitioner.

Steven L. Holcomb, Assistant Attorney General (J. Joseph Curran, Jr., Attorney General of Maryland, on brief), Baltimore, for respondent.

Argued before BELL, C.J., and ELDRIDGE, RAKER, WILNER, CATHELL, HARRELL and LAWRENCE F. RODOWSKY (retired, specially assigned), JJ.

RAKER, Judge.

This case arises out of a petition for post-conviction relief filed pursuant to the provisions of Maryland Code (1958, 1996 Repl.Vol., 2000 Supp.) Article 27, §§ 645A–645J, the Post Conviction Procedure Act. Following a court trial in the Circuit Court for Talbot County on January 16, 1979, Petitioner was convicted of two counts of robbery with a dangerous and deadly weapon, common law burglary, conspiracy to commit burglary, and use of a handgun in the commission of a felony. He was sentenced to the Maryland Division of Corrections for a term of confinement of fifty years, to be served consecutively to sentences previously imposed as a result of

unrelated Delaware and federal charges. On direct appeal, the Court of Special Appeals affirmed. *See Wilson v. State,* 44 Md.App. 318, 408 A.2d 1058 (1979). Wilson filed this petition for post-conviction relief in 1998.

In his petition, Wilson raised three grounds for post-conviction relief: (1) that he was denied due process of law because the State suppressed favorable material evidence in violation of *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963) and its progeny, (2) that he was denied effective assistance of counsel, and (3) prosecutorial misconduct. Following an evidentiary hearing, the Circuit Court for Anne Arundel County [1] granted Wilson's petition for post-conviction relief and awarded him a new trial because the State did not disclose favorable material evidence. In an unreported opinion, the Court of Special Appeals reversed. We granted Wilson's petition for writ of certiorari, and, because we agree with the post-conviction hearing court, we shall reverse the judgment of the intermediate appellate court.

## I.

We set out the facts of the crime as recounted by the post-conviction hearing court, supplementing them as needed:

"On the night of February 5, 1977, the home of a used car salesman named Calvin Scott was broken into by two masked men who were armed with guns. The intruders gained entrance into the home by firing a gun through the doorway as Calvin Scott was locking the home for the night.[1] In their search of the home, the intruders discovered an old safe. The intruders then beat both Calvin Scott and his wife, Elsie Mae, until Calvin Scott opened the safe from which approximately $71,000.00 in cash was stolen. Prior to the intruders' getaway, they handcuffed the Scotts

---

1. The case was transferred for hearing from the Circuit Court for Talbot County to the Circuit Court for Anne Arundel County because the circuit court judge in Talbot County recused himself.

to their iron bed frame where they remained until they were found the following afternoon by their granddaughter.

1 The bullet was found several days later. It was determined that the bullet came from a German Luger pistol.

"Two to three weeks after this crime, the police received information from an anonymous source, believed to have been the Petitioner's wife, that the Petitioner and Gary Reynolds may have been involved in the robbery. On March 11, 1977, the Petitioner was arrested in Florida on unrelated charges and several handguns were seized, including a German Luger. In subsequent state and federal prosecutions in Florida, the Petitioner admitted possession and ownership of the Luger. Furthermore, in June of 1977 the FBI determined that the Petitioner's Luger fired the bullet which was recovered from the Scott's home.

"The Petitioner, at his trial, testified that he was acquainted with the Maryland area and that in late January or early February, 1977, he met with Cable and Reynolds. He further testified that he sold his German Luger pistol to Cable who was interested in and collected guns from World War II. The Petitioner testified that this was the only contact that he ever had with Cable. The Petitioner's family testified that he was at a party in Boston on the night of the robbery.

"On May 18, 1977, Harkum gave a statement to the State's Attorney for Talbot County which was read into evidence at the Petitioner's trial. In his statement, Harkum, who worked with Calvin Scott as a used car salesman, admitted that he told Cable that the victim, Calvin Scott, kept large amounts of cash in his home. Harkum also said that Cable was involved in the Scott robbery. Harkum described Cable as a man of violent propensities who subsequently proposed that Harkum join him in other criminal undertakings. Harkum added that he was afraid of Cable. Harkum had no information or knowledge about the Petitioner or Reynolds but proffered that he had been given the

impression by Cable that a 'Wayne Morris' and/or a 'Larry Mears' may also have been involved in the robbery.[2]

2 The record does not reveal any follow-up investigation by the State of Wayne Morris who died prior to the trial, or of Larry Mears, who 'had suddenly shown up with $25,000 in cash to buy a boat.' *Wilson v. State,* 44 Md.App. 318, 321, 408 A.2d 1058 (1979).

"Cable, a bouncer at a night club in the Annapolis area, also testified for the State. He testified that while he was in Florida in autumn of 1976, he met with Reynolds in order to plan a robbery. Three to four months thereafter, Cable said that he had met Reynolds and the Petitioner at a bar in Glen Burnie. 'Then on Saturday, February 5, 1977, Reynolds, the [Petitioner] and a young woman named "Tammy" had come to his boat.' *Wilson v. State,* 44 Md.App. 318, 322, 408 A.2d 1058 (1979). 'The group drove over to Easton where Cable said he had pointed out the Scott residence before returning to the Annapolis area.' *Id.* 'Late that night Cable said he met with the trio again and was advised that the robbery had been accomplished.' *Id.* Cable testified that he was given a share of the proceeds from the robbery for the role he played."

Prior to trial, Petitioner filed a written request for discovery and inspection, specifically requesting information regarding all persons who had been offered immunity, favorable consideration, lesser pleas, or other agreements in return for their testimony, information, or documents. The State's response to that request was "not discoverable." No copy of any written plea agreement was ever produced by the State.

At trial, Cable made reference to a plea agreement that he had with the State. He testified on direct examination that he was presently in jail on pretrial detention and that he had not yet gone to trial on the charges arising from his involvement in the instant crime. He testified that "in return for testifying, the charges against him [would be] amended to two counts of conspiracy to commit armed robbery and that [his] total sentence [would be] a five year sentence." Additionally, he testified that unrelated drug and weapon charges in other jurisdictions would not be pursued by the State. When the

subject arose on cross-examination, Cable stated that his understanding was based on a *written* plea bargain agreement, negotiated by his attorney, who was present during his testimony.

Co-defendant James P. Harkum also testified for the State at Petitioner's trial, and he also made reference to a plea agreement with the State. Harkum testified that he had not been detained prior to trial and had not yet gone to trial. He testified that, in exchange for his testimony against Petitioner, his "arrangements with the State" were that he would receive jail time of an unknown duration and possible probation.

On January 20, 1979, Petitioner was convicted by a jury in the Circuit Court for Talbot County of two counts of armed robbery, burglary, conspiracy to commit burglary, and the use of a handgun in the commission of a crime of violence. He was sentenced to a term of incarceration of fifty years, to be served consecutive to unrelated Delaware and federal sentences.

Harkum entered a guilty plea to a single count of his indictment on January 24, 1979. Pursuant to a written plea agreement, Harkum was sentenced to a term of incarceration of twenty years, *all suspended,* with five years of probation. At Harkum's sentencing hearing, a two-page psychological report, prepared by Dr. Grumpelt, was included with his plea agreement in the hearing transcript. The report noted that Harkum had been Dr. Grumpelt's patient since August 16, 1977 and that he had been diagnosed with paranoid schizophrenia. The report also stated that Harkum was "confused and had numerous loose associations" and that he required "medication to keep in touch with reality." During the hearing, Harkum also testified that he had been hospitalized for mental health treatment and under the care of a psychiatrist.

On February 9, 1979, Cable entered a guilty plea to a single count of his indictment, also pursuant to a written plea agreement. Based on a sentence recommendation joined by the State and defense counsel, the court imposed a five-year sentence, *all suspended,* with credit for 349 days of pretrial

detention, and four years of probation. Cable was thereafter immediately released from custody.

Petitioner appealed to the Court of Special Appeals, alleging on direct appeal that the trial court had erred in failing to instruct the jury properly on reasonable doubt, that the trial court had erred in refusing to allow him to deliver his own closing argument, that the jury verdicts were coerced by the time limit imposed by the court on deliberations, that the burglary verdict was coerced by the court's supplemental jury instruction, that a motel registration card was improperly admitted as a business record, and that he was denied a fair and impartial trial because of the circumstances of his pretrial detention, his extradition to Maryland, and the court's refusal to grant him a continuance.[2] The Court of Special Appeals affirmed. *See Wilson v. State,* 44 Md.App. 318, 408 A.2d 1058 (1979). This Court denied his petition for certiorari. *See Wilson v. State,* 287 Md. 758 (1980).

On March 25, 1998, Petitioner filed this petition for post-conviction relief. On March 26, 1999, the Circuit Court granted post-conviction relief and granted a new trial on *Brady* grounds, that the prosecutor suppressed favorable, material evidence—namely, plea agreements with Harkum and Cable, a psychological report detailing information about Harkum's mental state, and the identity of a potential witness to rebut Petitioner's alibi defense who had been unable to place Peti-

---

2. At the outset, we make clear that we are disturbed about the amount of time that has elapsed between Petitioner's trial and the first time that he has raised his *Brady* claims before any court. Although the legal and factual bases for Petitioner's *Brady* claims may have been available to him prior to his direct appeal in this case, the State does not argue before us, nor did the State raise the issue in the post-conviction court, that Petitioner has procedurally defaulted on his *Brady* claims by failing to raise them on direct appeal. *See Oken v. State,* 343 Md. 256, 272–73, 681 A.2d 30, 38 (1996) (holding that the right in question was subject to the procedural default standard and not the "intelligently and knowingly" standard of waiver). Since the factual record is not sufficiently developed for us to reach the issue of procedural default, and since the State did not raise it in a cross-petition, we resolve Petitioner's case on the merits.

tioner with his codefendants on the night before the burglary—and ordered a new trial.

With respect to the plea agreements, the court found that the State knowingly failed to provide full disclosure of the agreements with Cable and Harkum, that the undisclosed agreements were favorable as they would have provided grounds for impeachment, and that the suppressed agreements were material since their suppression undermined confidence in the verdict and created at least a reasonable probability of a different result. With respect to the psychological report, the court found that the prosecution either knew or should have known of Harkum's mental illness, that the evidence regarding his schizophrenia was favorable to Petitioner as it would have provided strong grounds for impeachment, and that the evidence was material because there was a reasonable probability of a different outcome if the information had been available to Petitioner. Finally, with respect to the identity of the witness, Mark Hall, the court found that the State had withheld the witness's name, that the information was favorable because the witness could support Petitioner's alibi defense, and that the witness's identity was material because there was a reasonable probability of a different result if the jury had heard his testimony. The court also found, on related grounds, that the failure to disclose the plea agreements and the identity of the alibi witness constituted prosecutorial misconduct that entitled Petitioner to a new trial.

The State's application for leave to appeal was granted by the Court of Special Appeals, and that court reversed. With respect to the plea agreements, that court found that the jury already knew that Harkum and Cable were testifying pursuant to plea agreements and concluded, in light of the other evidence against Petitioner, that the potential impeachment value of the agreements was not material to the outcome of the trial. With respect to the psychological report, the court found that Mr. Harkum did not present any direct incriminating evidence against Petitioner and concluded, therefore, that, because none of Mr. Harkum's testimony harmed Petitioner,

"whether Mr. Harkum could have been more thoroughly impeached is irrelevant." Finally, with respect to the identity of Mark Hall, the court found that, up until the time that he testified at the hearing, the State thought that Mr. Hall was going to identify, not exonerate, Petitioner and that, once he failed to do so, the witness could have been called to testify by the defense.

We granted a writ of certiorari to consider the following questions raised in the petition:

I. Did the lower court err in concluding that the intentional withholding by the State of certain impeachment evidence regarding the State's two accomplice witnesses, together with knowing perjury by the prosecutor and the witnesses as to the existence of such evidence, was not sufficiently material to the outcome of the case and therefore harmless error?

II. Did the lower court err in holding that the psychiatric history of one of the State's accomplice witnesses, which history was also withheld from the Petitioner by the State, was irrelevant because the witness did not offer any direct incriminating evidence against Petitioner?

III. Did the lower court err in its determination that the State's discovery violation concerning the identity of a prosecution witness did not proximately result in a *Brady* violation?

## II.

Petitioner claims that the evidence in the record discloses that the State had written plea agreements with James Harkum and Peter Heinz Cable prior to their testimony at Petitioner's trial. Petitioner further contends that the State allowed both witnesses to mislead the jury by understating the favorable consideration in those agreements granted in exchange for their testimony and that the State compounded that deception by falsely emphasizing, in closing arguments, the credibility of the two witnesses and the lack of anything that they stood to gain by testifying against Petitioner. Peti-

tioner argues that the combination of lack of disclosure and misleading presentation rise to the level of a violation of *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), and its progeny because Harkum and Cable were central to the State's relatively weak circumstantial case against Petitioner and the substance of their plea agreements could have cast serious doubt on their credibility.

The State argues that the post-conviction court erred in finding that written plea agreements existed between the State and Harkum and Cable and that these witnesses lied about the existence of these agreements. As a fall-back position, the State argues that it elicited testimony at trial concerning any agreements from Harkum and Cable on direct examination. Thus, the State argues that, although disclosure might have occurred late in the case, it did occur in sufficient time to allow Wilson an opportunity effectively to cross-examine Harkum and Cable in an effort to impeach their credibility. Finally, the State maintains that any failure to provide plea agreements was not material because, considering the testimony of Harkum and Cable, both on direct and cross-examination, and considering the arguments of counsel in closing, the jury was well aware that these two witnesses were testifying pursuant to a deal.

### III.

The Supreme Court made clear in *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Id.* at 87, 83 S.Ct. 1194, 1196–97, 10 L.Ed.2d 215. In order to establish a *Brady* violation, Petitioner must establish "(1) that the prosecutor suppressed or withheld evidence that is (2) favorable to the defense—either because it is exculpatory, provides a basis for mitigation of sentence, or because it provides grounds for impeaching a witness—and (3) that the suppressed evidence is material." *Ware v. State,* 348 Md. 19, 38, 702 A.2d 699, 708

(1997). Evidence that is obviously favorable must be disclosed even absent a specific request by the defendant. *See* Maryland Rule 4–263(a); *United States v. Agurs,* 427 U.S. 97, 110–11, 96 S.Ct. 2392, 2401, 49 L.Ed.2d 342 (1976).

■ Impeachment evidence, as well as exculpatory evidence, is "evidence favorable to an accused." *United States v. Bagley,* 473 U.S. 667, 676, 105 S.Ct. 3375, 3380, 87 L.Ed.2d 481 (1985). *See Giglio v. United States,* 405 U.S. 150, 154, 92 S.Ct. 763, 766, 31 L.Ed.2d 104 (1972); *United States v. Kelly,* 35 F.3d 929, 936 (4th Cir.1994); *United States v. Shaffer,* 789 F.2d 682, 689 (9th Cir.1986); *Ware,* 348 Md. at 40–41, 702 A.2d at 709–10; *Chavis v. North Carolina,* 637 F.2d 213, 223 & n. 14 (4th Cir.1980); *United States v. Sutton,* 542 F.2d 1239, 1241–42 (4th Cir.1976); *Jimenez v. State,* 112 Nev. 610, 918 P.2d 687, 694 (1996); *cf. Napue v. People of Ill.,* 360 U.S. 264, 269, 79 S.Ct. 1173, 1177, 3 L.Ed.2d 1217 (1959) (holding that the prohibition against the use of false testimony applies even when the evidence goes only to the credibility of the witness because the jury's assessment of credibility can be determinative of guilt or innocence).

■ The failure to disclose evidence relating to any understanding or agreement with a key witness as to a future prosecution, in particular, violates due process, because such evidence is relevant to witness's credibility. *See Giglio,* 405 U.S. at 154–55, 92 S.Ct. 763, 766, 31 L.Ed.2d 104. The Supreme Court explained in *Giglio* that, when the government depends almost entirely on the testimony of a key witness to establish its prima facie case and the witness's credibility, therefore, is an important issue, "evidence of *any* understanding or agreement as to a future prosecution would be relevant to his credibility...." *See id* (emphasis added). This Court underscored the same point in *Ware* when we concluded that "the prosecutor's duty to disclose applies to *any* understanding or agreement between the witness and the State." *Ware,* 348 Md. at 41, 702 A.2d at 710 (emphasis in original).

■ The standard for measuring the materiality of the undisclosed evidence is strictest if it "demonstrates that the

prosecution's case includes perjured testimony and that the prosecution knew, or should have known, of the perjury." *Agurs,* 427 U.S. at 103, 96 S.Ct. 2392, 2397, 49 L.Ed.2d 342. In *Agurs,* the Supreme Court explained that "a conviction obtained by the knowing use of perjured testimony is fundamentally unfair, and must be set aside if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury." *Id. See Napue,* 360 U.S. at 272, 79 S.Ct. 1173, 1179, 3 L.Ed.2d 1217. In cases where there is no false testimony but the prosecution nonetheless fails to disclose favorable evidence, the standard for materiality, in the language of the Supreme Court, is whether "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." *Bagley,* 473 U.S. at 682, 105 S.Ct. 3375, 3383, 87 L.Ed.2d 481. *See Kyles v. Whitley,* 514 U.S. 419, 434, 115 S.Ct. 1555, 1566, 131 L.Ed.2d 490 (1995); *see also Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).[3] Materiality is assessed by considering all of the suppressed evidence collectively. *See Kyles,* 514 U.S. at 436, 115 S.Ct. at 1567, 131 L.Ed.2d 490. The question, therefore, "is not whether the State would have had a case to go to the jury if it had disclosed the favorable evidence, but whether we can be confident that the jury's verdict would have been the same," *id.* at 453, 115 S.Ct. at 1575, 131 L.Ed.2d 490, which is determined in reference to the sum of the evidence and its significance for the prosecution. *See id.*

## A. *Suppression of Evidence by the State*

As indicated above, the State argues that it had no written plea agreements with Harkum and Cable prior to their testi-

---

3. This Court has interpreted the reasonable probability standard from *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), to mean a "substantial possibility that ... the result of [the] trial would have been any different." *State v. Thomas,* 325 Md. 160, 190, 599 A.2d 1171, 1185 (1992). *See id.* at 190 n. 8, 599 A.2d at 1185 n. 8; *Bowers v. State,* 320 Md. 416, 426–27, 578 A.2d 734, 739 (1990).

mony at Petitioner's trial. It also argues, in the alternative, that any agreements that had been reached between the State and its star witnesses were portrayed accurately in their testimony and by the prosecutor in closing arguments.

This Court will not disturb the factual findings of the post-conviction court unless they are clearly erroneous. *See Oken v. State*, 343 Md. 256, 299, 681 A.2d 30, 51 (1996); *Gilliam v. State*, 331 Md. 651, 672, 629 A.2d 685, 696 (1993). The post-conviction hearing judge found as a fact that "the prosecution arranged written plea agreements with both Cable and Harkum prior to the Petitioner's trial." As the post-conviction judge pointed out, both Harkum and Cable made reference in their trial testimony to the existence of plea agreements; moreover, Cable testified that he had received a copy of a written plea agreement. In addition, after the conclusion of Petitioner's trial, both Harkum and Cable pleaded guilty and each was given a sentence, based on a joint recommendation by the State and defense, that was more favorable than that described at trial. The hearing judge's findings were not clearly erroneous.

The actual terms of the plea agreements were never disclosed to Petitioner by the State either before or during the trial. Therefore, this evidence was "suppressed" within the meaning of *Brady*.

### B. *Favorable to the Accused*

Clearly, the existence of any plea agreements between the State and the two key codefendant witnesses would have been favorable impeachment evidence for Petitioner. The more precise question in this case, however, is whether, in a situation where the witnesses have disclosed the existence of some form of agreement, but the specific terms of the agreement are unknown, and where the prosecution has failed to disclose the written agreements to the defense, or the accurate terms of the agreements, the agreements themselves constitute withheld favorable evidence, particularly in conjunc-

tion with their misleading characterizations by the witnesses and the prosecutor in closing arguments.

Under the facts of this case, it is hard to imagine how the written plea agreements would not have been favorable to Petitioner. First, while Petitioner's trial counsel was able to elicit some information about the agreements from the witnesses on the stand, he could not effectively challenge their testimony regarding the content of those agreements, much less impeach their credibility, without a copy of the written agreements. Second, as subsequent events indicated, the disclosure of the plea agreements by the witnesses on the stand was not entirely accurate, and that inaccuracy was compounded by the State's characterization of the agreements and the witnesses's motives to testify in closing arguments.

The difference between the terms of the plea agreements as represented at Petitioner's trial and their terms as actually implemented was significant. With respect to both Harkum and Cable, the jury was led to believe that the witnesses would be incarcerated for their respective roles in the robbery when, in fact, both men's sentences were suspended just after the conclusion of Petitioner's trial, upon the recommendation of the State. The specific terms of the written plea agreements were, therefore, favorable to Petitioner.

In *United States v. Shaffer*, 789 F.2d 682 (9th Cir.1986), in response to specific and general discovery requests regarding promises that ·the government had made to an unindicted coconspirator, the prosecutor disclosed the coconspirator's grand jury testimony and a copy of his immunity agreement to the defense, but failed to disclose the full extent of the coconspirator's cooperation as a government informant and the compensation for his services. The United States Court of Appeals for the Ninth Circuit rejected the government's argument that its disclosure was sufficient, explaining that the extent of the witness' cooperation with the government was, by itself, favorable to the defendant's impeachment strategy and should have been disclosed. *See Shaffer*, 789 F.2d at 689 & n. 7.

Furthermore, this Court has held, in the context of the right to cross-examination guaranteed by the Confrontation Clause of the Sixth Amendment of the United States Constitution and Article 21 of the Maryland Declaration of Rights, that "[w]here a witness has a 'deal' with the State, the jury is entitled to know the terms of the agreement and to assess whether the 'deal' would reasonably tend to indicate that his testimony has been influenced by bias or motive to testify falsely." *Marshall v. State*, 346 Md. 186, 197–98, 695 A.2d 184, 189–90 (1997).

■ The State argues that, even if there was some promise of leniency for Harkum and Cable prior to their testimony, the agreements were not finalized and that fuller disclosure, therefore, would not have been possible. Even assuming, *arguendo*, that the terms of the plea agreements between the State and Harkum and Cable were not finalized at the time of their testimony, that does not alleviate the State's obligation to disclose the material evidence. In fact, a tentative plea bargain can be even more probative of a witness's motivations in testifying than a finalized one because it may be more likely that the witness will perceive that the agreement is contingent upon his or her performance on the stand. As the United States Court of Appeals for the Fourth Circuit explained in *Campbell v. Reed*, 594 F.2d 4 (4th Cir.1979):

> The fact that [the witness] was not aware of the exact terms of the plea agreement only increases the significance, for purposes of assessing credibility, of his expectation of favorable treatment.... [A] tentative promise of leniency might be interpreted by a witness as contingent upon the nature of his testimony. Thus, there would be a greater incentive for the witness to try to make his testimony pleasing to the prosecutor. That a witness may curry favor with a prosecutor by his testimony was demonstrated when the prosecutor renegotiated a more favorable plea agreement with [the witness] after [the defendant] was convicted.

*Id.* at 7–8 (internal citations omitted). *See Boone v. Paderick*, 541 F.2d 447, 451 (4th Cir.1976).

 Furthermore, cross-examination of the witnesses regarding inducements to testify does not substitute for adequate disclosure. *See Reutter v. Solem,* 888 F.2d 578, 581 (8th Cir.1989); *Sutton,* 542 F.2d at 1243; *Boone,* 541 F.2d at 451 (noting that "no matter how good defense counsel's argument may have been, it was apparent to the jury that it rested upon conjecture—a conjecture which the prosecutor disputed"); *Commonwealth v. Collins,* 386 Mass. 1, 434 N.E.2d 964, 971 (1982).

## C. *Material to the Defense*

 Arguably, the materiality of the withheld plea bargains in this case should be analyzed under the *Napue/Agurs* strict standard of materiality for perjured testimony—namely, that a reversal of Petitioner's conviction is warranted if there is "any reasonable likelihood that the false testimony could have affected the judgment of the jury." *Agurs,* 427 U.S. at 103, 96 S.Ct. at 2397, 49 L.Ed.2d 342. For example, in *Jimenez,* 918 P.2d at 687, the State's jailhouse informant denied having received any benefits from the State in exchange for his testimony on the stand, when, in fact, the witness was an active police informant, and the police had arranged for criminal charges against him to be dismissed. In that case, the Supreme Court of Nevada applied the strict standard of materiality, characterizing the informant's trial testimony as "at best inaccurate and at worst perjury." *Id.* at 694. In addition, the Massachusetts Supreme Judicial Court recently held that any time that, " 'through misfeasance or nonfeasance by the prosecutor, false testimony is introduced concerning an arrangement between the witness and the prosecutor, a strict standard of materiality is applied. A conviction will be set aside if there is "any reasonable likelihood that the false testimony could have affected the judgment of the jury." ' " *Commonwealth v. Hill,* 432 Mass. 704, 739 N.E.2d 670, 679 (2000) (quoting *Commonwealth v. Gilday,* 382 Mass. 166, 415 N.E.2d 797, 803 (1980)).

Nonetheless, we do not need to decide whether the testimony of Harkum and Cable in this case constituted testimony

that the State knew or should have known was perjured, since the undisclosed plea agreements are material to the outcome of Petitioner's case even under the *Brady/Bagley* materiality standard, because we are confident that, had the evidence been disclosed, there is a substantial possibility that the verdict in Petitioner's case would have been different.

 We discern several factors to which courts have looked to assess materiality for the purposes of suppressed impeachment evidence: the specificity of the defendant's request for disclosure of materials, *see People v. Cwikla*, 46 N.Y.2d 434, 414 N.Y.S.2d 102, 386 N.E.2d 1070, 1074 (1979); the closeness of the case against the defendant and the cumulative weight of the other independent evidence of guilt, *see United States v. Noriega*, 117 F.3d 1206, 1219 (11th Cir.1997); *United States v. Amiel*, 95 F.3d 135, 145–46 (2nd Cir.1996); *United States v. Payne*, 63 F.3d 1200, 1210–11 (2nd Cir.1995); *In re Pratt*, 69 Cal.App.4th 1294, 82 Cal.Rptr.2d 260, 276 (1999); *Jimenez*, 918 P.2d at 693; the centrality of the particular witness to the State's case, *see Noriega*, 117 F.3d at 1219–20; *Payne*, 63 F.3d at 1210; *Reutter*, 888 F.2d at 581; *Ware*, 348 Md. at 51–52, 702 A.2d at 714–15; *Collins*, 434 N.E.2d at 969 n. 10; *Jimenez*, 918 P.2d at 695; the significance of the inducement to testify, *see Ware*, 348 Md. at 51–52, 702 A.2d at 714; whether and to what extent the witness's credibility is already in question, *see Noriega*, 117 F.3d at 1219; *Payne*, 63 F.3d at 1210; and the prosecutorial emphasis on the witness's credibility in closing arguments, *see Reutter*, 888 F.2d at 582; *Pratt*, 82 Cal.Rptr.2d at 277; *Ware*, 348 Md. at 53–54, 702 A.2d at 715–16; *Cwikla*, 414 N.Y.S.2d 102, 386 N.E.2d at 1074.

Applying these factors, we conclude that, had the plea agreements between the State and Harkum and Cable been disclosed to Petitioner prior to his trial, there is a substantial possibility that the outcome in his case would have been different such that we cannot have confidence in the verdict. Therefore, the suppressed plea agreements were material under *Brady*.

First, as we indicated above, Petitioner made a specific request for the withheld materials. Second, the case against Petitioner was a close one, and the testimony of Harkum and Cable was central to the case. Cable's testimony provided the only direct link between Petitioner and the crime, and Harkum's testimony corroborated Cable. As admitted coconspirators in the robbery, Petitioner's conviction depended upon the jury believing that they were offering truthful testimony about his involvement. Petitioner was able to offer an explanation for all of the other circumstantial evidence in the case (the ballistics evidence and the motel registration) and had an alibi. The jury's assessment of the credibility of Harkum and Cable was most likely a determining factor in the guilty verdict against Petitioner. As the United States Court of Appeals for the Second Circuit explained: "In general, impeachment evidence has been found to be material where the witness at issue 'supplied the only evidence linking the defendant(s) to the crime,' ... or where the likely impact on the witness's credibility would have undermined a critical element of the prosecution's case...." *Payne*, 63 F.3d at 1210 (internal citations omitted). *See Noriega*, 117 F.3d at 1219; *Jimenez*, 918 P.2d at 695.

Third, the suppressed plea agreements provided Harkum and Cable with a significant inducement to testify falsely. Cable, an admitted principal in the robbery, served one year in jail. Harkum was never incarcerated for his involvement. In contrast, Petitioner was sentenced to fifty years of incarceration. Had the jury known the true extent of the leniency being given to Harkum and Cable in exchange for their testimony, it might have assessed their credibility differently.

Fourth, as we indicated above, while Petitioner's trial counsel attempted to cross-examine Harkum and Cable on the issue of their credibility, that attempt was far less effective than it would have been had he possessed the written plea agreements. Because of the suppression of this important impeachment material, neither witness's credibility was effectively in question at Petitioner's trial.

Fifth, as we also indicated above, the State specifically emphasized the credibility of Harkum and Cable in closing arguments, misleading the jury about the potential for their imminent incarceration and stressing the total lack of motive for either to testify falsely. This is perhaps the most compelling example of the materiality of the withheld plea bargains. In closing argument, the State characterized Harkum's motive for testifying as follows:

Mr. Harkum, for reasons best known to himself, decided to tell about it.

You had a chance to look at Mr. Harkum, you saw him on the stand, not only one time, but in the defendant's case for a very long time. And I think you probably know why Harkum came forward. I think you know he's a nervous kind of guy, he's the kind of guy that probably couldn't hold this information inside of him for a very long period of time. . . .

Harkum came forward, and he told it all, all that he knew to tell, as he understood it.

The prosecutor also argued:

Now, let's be honest. Harkum is going to minimize, if he can, his involvement in this thing, and so is Marty Cable. They're both caught, they're both charged, they're both "in the bag", so to speak, and they're both going to go to trial. The evidence, I submit, will be sufficient to convict both of them.

With respect to Cable's credibility, the State argued: "I submit to you that Marty Cable's statements have been corroborated, and you can't throw it out. He has admitted his guilt. He has told you that he is going to get a jail sentence. So you can't throw his testimony out all together." Finally, in its rebuttal closing argument, the State concluded as follows:

Counsel has taken certain shots at the State, indicating that the State has worked out some magnificent deal for Marty Cable, that the State has paid Marty Cable off.

Well, ladies and gentlemen, Marty Cable has not even been convicted yet. His arrangement was that if he were to

testify and assist the State, then the State would agree to a five-year sentence. He has already served approximately a year of that. And if he's fortunate enough to be paroled, then that's his good fortune. He has come forward, as has Mr. Harkum.

As we stated previously in *Ware*, "the 'likely damage' of the State's suppression of evidence in this case 'is best understood by taking the word of the prosecutor ... during closing argument.'" *Ware*, 348 Md. at 53, 702 A.2d at 715 (citations omitted). Given that the State went out of its way, in closing argument, to use the mischaracterization of the plea agreements as a specific argument in favor of the credibility of its key witnesses and to rebut Petitioner's attempts to impeach them, it seems disingenuous, at this point, for the State to assert that, had the jury known the truth about the plea agreements, it would not have decided Petitioner's case differently.

This case is strikingly similar to *Collins*, 434 N.E.2d at 964. In that case, the Commonwealth of Massachusetts suppressed evidence of an arrangement that it had with the key witness against the defendant at trial, the witness denied that his testimony against the defendant was given in exchange for leniency although he admitted that he hoped to receive lighter treatment, and the prosecutor, in closing argument, stressed that the witness was going to receive ample punishment for his involvement in the crime just like the defendant. *See id.* at 966–67. The Massachusetts Supreme Judicial Court concluded that the Commonwealth's failure to disclose the plea agreement and the prosecutor's misrepresentations in closing arguments each individually warranted a reversal of the defendant's conviction. *See id.* at 970–71. The court concluded:

> [T]he prosecutor must have been able to assess the impact on the jury of knowledge of [the witness's] chances after the defendant's trial. His closing remarks give the appearance of careful construction intended to impart a very definite meaning. . . . The image of [the witness] he chose to present to them was not that of a man who had made some arrangements with the authorities to ensure a lesser punish-

ment. Rather, he presented a man who, solely out of principle, had chosen to testify to a series of events which would land him in prison for the rest of his life. In this light, [the witness's] testimony could be cloaked in an aura of credibility in the past attributed to dying declarations.

*Id.* at 972 (internal citations omitted). The conclusion seems equally suited to this case.

In failing to disclose the plea agreements that it had with Harkum and Cable, particularly in conjunction with the false testimony that they offered and the misleading closing arguments by the prosecutor, the State did not fulfill its constitutionally mandated obligations under *Brady* and its progeny to disclose to Petitioner any favorable evidence material to his defense. The constitutional error here was the State's failure to assist the defense by disclosing information that might have been helpful in conducting cross-examination, which deprived Petitioner of a fair trial. *See Bagley,* 473 U.S. at 678, 105 S.Ct. at 3381, 87 L.Ed.2d 481.[4]

*JUDGMENT OF THE COURT OF SPECIAL APPEALS REVERSED. CASE REMANDED TO THAT COURT WITH INSTRUCTIONS TO AFFIRM THE JUDGMENT OF THE CIRCUIT COURT FOR ANNE ARUNDEL COUNTY. COSTS IN THIS COURT AND IN THE COURT OF SPECIAL APPEALS TO BE PAID BY RESPONDENT.*

---

**4.** As the State's failure to disclose the plea agreements by itself warrants a reversal of Petitioner's conviction, we do not reach the issue of whether it also violated *Brady* by failing to disclose the psychological report regarding Harkum or the identity of Mark Hall as a potential rebuttal witness.